28

EGMIDIO DEFENDINI COLLAZO, RUFINA ACOSTA MEJÍAS y ED DE-
FENDINI ACOSTA, demandantes y recurrentes, *v.* ESTADO LI-
BRE ASOCIADO DE PUERTO RICO y, JUAN J. COTTO, demanda-
dos y recurridos; EGMIDIO DEFENDINI COLLAZO, RUFINA
ACOSTA MEJÍAS y la SOCIEDAD DE GANANCIALES compuesta
por ambos, y ED DEFENDINI ACOSTA, demandantes y recu-
rridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y JUAN J.
COTTO, ETC., demandados y recurrente el primero; M.F.R.
y su hijo menor J.A.Q.F., demandantes y recurrentes, *v.*
VÍCTOR M. ÁLAMO GARCÍA, ETC., demandados y recurridos.

*Números:* RE-88-196 *Resueltos:* 15 de julio de 1993
RE-88-199
RE-90-371

32

*José A. Cuevas Segarra*, de *Bernier & Cuevas Segarra*, abogado de los recurrentes; *Rafael Ortiz Carrión, Procurador General*, y *María Adaljisa Dávila, Procuradora General Auxiliar*, abogados de El Pueblo.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Se nos cuestiona la constitucionalidad de los Arts. 2 y 7 de la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. secs. 3077 y 3082. Éstos disponen una cantidad máxima compensable para reclamaciones por daños y perjuicios causados por acción u omisión culposa o negligente de cualquier funcionario, agente o empleado del Estado Libre Asociado de Puerto Rico ocurridos mientras actuaba en capacidad oficial y dentro del marco de sus funciones. Hemos consolidado los recursos que plantean esta controversia: *Defendini Collazo v. E.L.A.*, RE-88-196, RE-88-199, y *Fuentes v. Álamo*, RE-90-371.

I

*Hechos*

A. *Defendini Collazo v. E.L.A., RE-88-196, RE-88-199*

El 27 de octubre de 1984, cerca de las nueve de la noche (9:00 P.M.), la Sra. María Calas llamó a un cuartel de la Policía para informar que una persona estaba rompiendo focos de la Autoridad de Energía Eléctrica en la segunda sección de la Urbanización Turabo Gardens de Caguas. El

Policía Juan J. Cotto fue al lugar y, luego de hablar con la querellante, se dirigió al patio de la casa donde se encontraba el poste de alumbrado en cuestión. Esta resultó ser la casa del codemandante Sr. Ed Defendini. El policía Cotto estacionó su patrulla en dirección al patio de la casa de Defendini y dejó las luces encendidas. Además, desenfundó su revólver tan pronto llegó al lugar.

Al observar al señor Defendini, el policía Cotto le indicó que se acercara. Defendini comenzó a correr en dirección a su residencia, atravesó ésta y salió hacia la calle con el propósito de huir. El policía le siguió para arrestarle e hizo un disparo al aire. Defendini se detuvo y le propinó una patada en el pecho al policía. Comenzaron a forcejear y, en medio de la lucha, ocurrió el segundo disparo que hirió al señor Defendini en la región de la ingle de la pierna izquierda. Esto le ocasionó una fractura del fémur.

Defendini estuvo hospitalizado desde 28 de octubre hasta el 8 de noviembre de 1984 en el Hospital Universitario. Allí se le practicó una cirugía y se le colocó un yeso que lo inmovilizó totalmente durante mes y medio. El 9 de noviembre fue trasladado al Hospital Subregional de Caguas. El 17 de enero de 1985 fue dado de alta.

Como resultado de este incidente, Ed Defendini quedó con incapacidad de movimiento en la extremidad izquierda. Ésta sufrió un acortamiento de tres (3) pulgadas. El señor Defendini necesita utilizar muletas para moverse de un sitio a otro.

El 5 de febrero de 1985 Ed Defendini, su padre Egmidio Defendini, su madre Rufina Acosta y la sociedad de gananciales compuesta por éstos últimos demandaron al Estado Libre Asociado de Puerto Rico (en adelante E.L.A.) y al Policía Juan J. Cotto en daños y perjuicios por razón del incidente ocurrido entre Ed Defendini y el policía Cotto. Los demandantes alegaron que mientras Cotto realizaba funciones oficiales como policía para el E.L.A. agredió negligentemente a Defendini, ocasionándole daños.

El Tribunal Superior, Sala de Caguas, en Sentencia Parcial de 14 de septiembre de 1987 determinó que el E.L.A. responde por la actuación negligente del policía Cotto. Posteriormente se celebró una vista para determinar el monto de las compensaciones a concederse. En Sentencia de 15 de diciembre de 1987 el tribunal de instancia concedió a Ed Defendini doscientos mil dólares ($200,000) por concepto de sufrimientos físicos y mentales, y veintitrés mil doscientos cuarenta y nueve dólares ($23,249) por disminución de su capacidad productiva. Al Sr. Egmidio Defendini le concedió dieciocho mil dólares ($18,000) en compensación por sus angustias mentales y cinco mil trescientos cincuenta dólares ($5,350) por gastos incurridos y gastos futuros relacionados con el cuido de su hijo. A la Sra. Rufina Acosta se le adjudicaron trece mil dólares ($13,000) en concepto de angustias mentales.[1] Sin embargo, el tribunal añadió que por razón de la aplicación de los límites de cuantías dispuestos por la Ley Núm. 104, *supra*, el monto total de la compensación a pagarse a los demandantes no podía exceder el tope de ciento cincuenta mil dólares ($150,000). Por esto ordenó que se prorratearan las cuantías adjudicadas.

De esta sentencia recurrieron ante nos, tanto los demandantes como el E.L.A. Los demandantes en el recurso RE-88-196 alegaron que el foro de instancia erró:

> ...al reconocer la inmunidad del soberano imponiendo límites sobre las cuantías concedidas y al no imponer honorarios de abogados, ni intereses a partir de la radicación de la demanda.[2]

---

[1] La reclamación de la sociedad legal de gananciales fue desestimada por el tribunal porque el Sr. Egmidio Defendini y la Sra. Rufina Acosta estaban divorciados.

[2] Por no ser necesario debido a la conclusión a que llegamos, no discutiremos el segundo señalamiento de error relativo a la razonabilidad de las reclamaciones concedidas.

"Erró el Honorable Tribunal Superior, Sala de Caguas, como cuestión de derecho, al conceder compensaciones mínimas e irrazonables en daños a pesar de la prueba còntundente desfilada."

Por su parte, el E.L.A., en su recurso de revisión RE-88-199, alegó la comisión del error siguiente:

(1)Erró el Tribunal de Instancia, al dictar una sentencia contra el Estado Libre Asociado imponiendo el pago de una indemnización total de $254,249.00 a los tres demandantes incluyendo $223,249.00 a uno de ellos en clara contravención con lo dispuesto por la Ley Núm. 104 de 29 de junio de 1955, según enmendada. En la que establece un límite de responsabilidad del Estado de $75,000.00 en casos de un reclamante con una sola causa de acción y de $150,000.00 en casos de un reclamante con varias causas de acción o en casos de varios reclamantes.

## B. *M.F.R. v. Álamo García, RE–90–371*[3]

El 24 de abril de 1987 el niño J.A.Q.F. (en adelante José), de siete (7) años de edad, cursaba el segundo grado en la Escuela Segunda Unidad de Sabana en Luquillo. Ésta colinda con una finca privada de vegetación abundante. Para la fecha antes señalada, la escuela no disponía de servicio de vigilancia.

Ese día, cerca de las once de la mañana (11:00 A.M.), José y otros estudiantes disfrutaban de la hora del recreo dentro de los predios de la escuela. Apareció, entonces, el Sr. Víctor Álamo por el lado exterior de la verja de alambre eslabonado de la escuela. Álamo llamó a José y le tiró unas monedas junto a un envase vacío para que se lo llenara de agua del comedor escolar. José buscó el agua y al ir a entregarla atravesó un gran hueco que había en la verja. Álamo y José desaparecieron entre la vegetación de la finca colindante.

Algún tiempo después regresó José. Éste lloraba y sus compañeros lo llevaron ante la directora. Ésta y la trabajadora social lo interrogaron. José tenía hierba adherida a su camisa y tierra en sus manos, gemía constantemente y

---

[3] Para proteger la privacidad de los demandantes utilizamos las iniciales de sus nombres.

se resistió a hablar. Sólo expresó que un hombre se lo había llevado.

La directora y la trabajadora social llevaron a José donde se encontraba su madre. Luego, todos fueron al consultorio del pediatra doctor Vázquez, en Fajardo. El doctor diagnosticó que el niño había sido sodomizado. Informó sobre lo ocurrido a la Policía y ordenó la hospitalización del menor. José tuvo que ser intervenido quirúrgicamente. Estuvo seis (6) días en el Hospital Dr. Gubern en Fajardo.

El 2 de junio de 1987 la madre de José y éste demandaron en daños y perjuicios al Departamento de Educación, al Sr. Víctor Álamo, a la Sra. Alejandrina Ríos, directora de la escuela, al Sr. Florentino Figueroa, empleado del Municipio de Luquillo, y al Sr. Ovidio Figueroa, Alcalde de Luquillo. Los demandantes alegaron que los funcionarios del Estado actuaron negligentemente al incumplir su deber de vigilancia en favor de los estudiantes del plantel escolar.

El 6 de octubre de 1987 el Tribunal Superior, Sala de Humacao, dictó sentencia parcial desestimando la demanda en cuanto a Ovidio Figueroa. Posteriormente el E.L.A. radicó demanda contra tercero, contra el Sr. Florentino Figueroa y el Municipio de Luquillo imputando que ellos eran los encargados de la vigilancia del plantel. El Estado, luego, desistió de su demanda contra tercero.

La vista en su fondo se celebró el 3 y 4 de abril de 1990.[4] El 6 de abril el tribunal emitió sentencia en la que declaró que el E.L.A. y Víctor Álamo eran responsables solidariamente por los daños sufridos por los demandantes.

El tribunal de instancia calculó la compensación por los daños morales del menor en ciento veinticinco mil dólares ($125,000), los daños físicos en quince mil dólares ($15,000), y los daños patrimoniales consistentes en el tratamiento psiquiátrico futuro en veinticinco mil dólares

---

[4] Los demandantes desistieron de su acción contra Alejandrina Ríos.

($25,000). Con relación a la codemandante M.F.R., el tribunal determinó que sus daños morales ascienden a setenta mil dólares ($70,000) y los patrimoniales a diez mil dólares ($10,000). No obstante, añadió:

> Por la limitación a la responsabilidad del Estado que impone la Ley Núm. 104 del 30 de junio de 1955, en su Art. 2, según ha sido repetidamente reformado, y cuya constitucionalidad sostenemos, se condena al ESTADO al pago de $75,000 al menor JOSE, y $75,000 a la madre, la SRA. M.F.R., más las costas y gastos del pleito.

Los demandantes presentaron recurso de revisión contra la sentencia. En éste alegaron que el foro de instancia erró:

> ... al no resolver que los Artículos 2 y 7 de la Ley 104 del 29 de junio de 1955, según enmendada son inconstitucionales.(5)

Examinaremos, en primer lugar, la controversia relativa a la constitucionalidad de los Arts. 2 y 7 de la Ley Núm. 104, *supra*.(6) Esta ley constituye una renuncia par-

---

(5) Con respecto al señalamiento de que el foro de instancia erró "al establecer unas partidas en concepto de daños al menor José ... muy bajas tomando en consideración la magnitud de los mismos", es innecesario que lo consideremos por razón de la conclusión a la que llegamos. Los demandantes, además, alegan que se cometió error "al no imponer intereses ni honorarios de abogado al Estado Libre Asociado de Puerto Rico, según lo solicitado en la demanda". Reiteradamente hemos resuelto que no procede una condena al pago de intereses y honorarios de abogado contra el E.L.A. Art. 8 de la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. sec. 3083; Regla 44.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Colondres Vélez v. Bayrón Vélez*, 114 D.P.R. 833, 841 y 843 (1983); *De León v. Sria. de Instrucción*, 116 D.P.R. 687, 688 (1985); *Pamel Corp. v. E.L.A.*, 124 D.P.R. 853 (1989).

(6) "Se autoriza demandar al Estado Libre Asociado de Puerto Rico ante el Tribunal de Primera Instancia de Puerto Rico por las causas siguientes:

"(a) Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000) dólares causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia. Cuando por tal acción u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de ciento cincuenta mil (150,000) dólares. Si de las conclusiones del tribunal surgiera que la suma de los daños causados a cada una de las personas excede de ciento cincuenta mil (150,000) dólares, el

cial condicionada de la inmunidad soberana que protege al Estado. *Meléndez v. E.L.A.*, 81 D.P.R. 824, 826–827 (1960).([7]) Comenzaremos nuestro análisis con un trasfondo histórico de la doctrina de la inmunidad soberana.

## II

### Trasfondo histórico

■ La inmunidad soberana es una doctrina que impide que se inste un procedimiento judicial contra el Estado en las cortes estatales, a menos que éste consienta a ello. Además, postula que el Estado no responde por los daños ocasionados por sus oficiales, agentes o empleados en el desempeño de sus funciones. *Civil Actions Against State and Local Government, Its Divisions, Agencies and Officers*, 2da ed., Colorado, Ed. Mc Graw–Hill, 1992, Vol. 1,

---

tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. Cuando se radique una acción contra el Estado por daños y perjuicios a la persona o a la propiedad, el tribunal ordenará, mediante la publicación de edictos en un periódico de circulación general, que se notifique a todas las personas que pudieran tener interés común, que deberán comparecer ante el tribunal, en la fecha dispuesta en los edictos, para que sean acumuladas a los fines de proceder a distribuir la cantidad de ciento cincuenta mil (150,000) dólares entre los demandantes, según se provee en las secs. 3077 *et seq.* de este título.

"(b) Acciones para reivindicar propiedad mueble e inmueble, o derechos sobre las mismas, con o sin resarcimiento de perjuicios por los daños causados en dicha propiedad o por sus rentas y utilidades y para deslinde de fincas rústicas.

"(c) Acciones civiles en que la cuantía reclamada no exceda de setenta y cinco mil (75,000) dólares de principal, y que se funden en la Constitución, o en cualquier ley de Puerto Rico, o en cualquier reglamento de algún departamento o división del Estado, o en algún contrato expreso o tácito con el Estado." Art. 2 de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3077.

"El Estado satisfará prontamente cualquier fallo en su contra hasta el máximo señalado en la sec. 3077 de este título. Si se tratase del pago de una suma de dinero y no fuere posible hacerlo por no existir fondos a tal fin en el presupuesto corriente, se hará la correspondiente asignación de fondos para su pago en la parte del presupuesto general de gastos del siguiente año del departamento o agencia correspondiente." Art. 7 de la Ley Núm. 104, *supra*, sec. 3082.

([7]) Ésta no es la única ley en la que el Estado ha consentido para que se le demande. El ha dado su consentimiento para ser demandado en otras situaciones a través de distintas leyes. Véase Art. 404 del Código Político, 3 L.P.R.A. sec. 422; Art. 32 de la Ley Núm. 81 de 14 de marzo de 1912 (3 L.P.R.A. sec. 183); *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 D.P.R. 702 (1990); *Alava e Iturregui v. Pueblo de Puerto Rico*, 20 D.P.R. 90 (1914).

pág. 2; *Black's Law Dictionary*, 5ta ed., St. Paul, Ed. West Publishing Co., 1979, pág. 1252; F. Harper, F. James y O. Gray, *The Law of Torts*, 2da ed., Boston, Ed. Little, Brown and Co., 1986, Vol. 5, pág. 596.

La mayoría de los tratadistas sostienen que la doctrina proviene del derecho anglosajón.[8] Harper, James y Gray, op. cit., págs. 597–600; *Civil Actions Against State and Local Government, Its Divisions, Agencies and Officers*, supra, pág. 19; G.U. Pugh, *Historical Approach to the Doctrine of Sovereign Immunity*, 13 La. L. Rev. 476, 477 (1953). Sus orígenes se remontan a la época feudal europea. Esta doctrina constituye la conceptuación de un fenómeno que ocurría por razón de la jerarquía de autoridad existente en la sociedad feudal.

El fundamento de dicha sociedad lo constituían los vasallos. El señor feudal ejercía la autoridad sobre ellos. Las disputas entre vasallos eran resueltas por éste. Él implantaba la ley y el derecho entre sus vasallos, pero era imposible que ellos procuraran hacer reclamaciones en su contra debido a que el señor feudal era el juez de las controversias y quien disponía los remedios. Entre él y sus vasallos no existía otro juez, sino él mismo. Por lo tanto, era conceptual y materialmente imposible que él adjudicara una reclamación en contra suya.

Dentro de esta organización social, el señor feudal era, a su vez, vasallo de otro señor y estaba sujeto a las cortes de éste. A este segundo nivel de autoridad se repetía la misma situación que impedía que el señor feudal fuera objeto de reclamación alguna ante sus propias cortes.

---

(8) Otros consideran que existía un precepto similar en el Derecho romano. A estos efectos citan del Digesto, "[e]l príncipe está libre de las leyes; a la Augusta, aunque no está libre de las leyes, los príncipes le otorgan, no obstante, los mismos privilegios que ellos tienen". D.1,3,31. Véase R. Parker, *The King Does No Wrong–Liability for Misadministration*, 5 Vand. L. Rev. 167 (1952).

Sin embargo, hay quienes consideran que la norma prevaleciente en el Derecho Civil romano era la de la responsabilidad del Estado. *Galarza Soto v. E.L.A.*, 109 D.P.R. 179, 187 (1979), opinión disidente en parte y concurrente en parte del Juez Asociado Señor Rigau.

Este fenómeno se repetía hasta llegar al más alto nivel en la pirámide de autoridad, el Rey. Éste no podía ser obligado a responder ante reclamaciones de sus inferiores. No existía tribunal superior a él que le pudiera compeler a actuar. Véanse: L. Hurwitz, *The State as a Defendant: Governmental Accountability and the Redress of Individual Grievances*, Connecticut, Ed. Greenwood Press, 1981, pág. 11; H. Street, *Governmental Liability: A Comparative Study*, London, Cambridge University Press, 1953, pág. 1; D.E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 2–3 (1972).

■ En resumen, las primeras manifestaciones de lo que luego se conocerá como la doctrina de la inmunidad soberana son producto de la peculiar organización y ejercicio de la autoridad en el sistema feudal y no de la creencia de que los señores feudales o el Rey estuvieran por encima de la ley. Pugh, *supra*, pág. 478; Harper, James y Gray, op. cit., pág. 598.

Luego, el desarrollo del Estado como entidad política y el concepto del derecho divino de los reyes hicieron que la inmunidad feudal evolucionara hasta convertirse en la inmunidad de la monarquía inglesa. Pugh, *supra*, págs. 478–479. Ésta se sustentaba en la idea de que el Rey era incapaz de ocasionar daños.([9]) Íd.

Sin embargo, el hecho de que no se pudiera demandar al Rey *eo nomine* no impedía que se obtuviese remedio contra el Estado. Existían diversos procedimientos judiciales para lograr esto. El más conocido de ellos es el llamado *petition of right*. Éste era un procedimiento a través del cual se solicitaba el consentimiento del Rey para que se adjudicara una controversia que pudiera tener impacto sobre intereses propietarios de la Corona o el Tesoro. El *petition of*

---

([9]) Para críticas a esta declaración, véanse: J.D. Lee y B.A. Lindahl, *Modern Tort Law: Liability and Litigation*, Illinois, Ed. Callaghan, 1988, Vol. I, Sec. 16.01, pág. 553; L.L. Jaffe, *Suits Againts Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 3 (1963).

*right* no estaba disponible para instar acciones por daños y perjuicios causados por los servidores del Rey. En estos casos sólo se permitía que la víctima demandara al oficial en su carácter personal. L.L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 2–19 (1963); Pugh, *supra*, págs. 479–480.

■ El concepto de la inmunidad soberana pasó de Inglaterra a Estados Unidos. Varios estudiosos sostienen que la incorporación de esta doctrina en el derecho estadounidense es un misterio debido a la falta de justificación histórica y filosófica para ello. J.D. Lee y B.A. Lindahl, *Modern Tort Law: Liability and Litigation*, Illinois, Ed. Callaghan, 1988, Vol. I, Sec. 16.01, pág. 553; Harper, James y Gray, *op. cit.*, pág. 599; Street, *supra*, pág. 8; Pugh, *supra*, págs. 480–481. Algunos señalan que la doctrina se adoptó como parte del *common law* prevaleciente en ese momento. Pugh, *supra*, pág. 480; Street, *supra*, pág. 8. Sin embargo, la posición mayoritaria se inclina por una explicación contraria. Ésta sostiene que durante la guerra de independencia los estados incurrieron en una cantidad sustancial de deudas y que, con el fin de evitar el cobro judicial de las mismas, éstos dieron su avenencia a la doctrina de la inmunidad soberana. Engdahl, *supra*, pág. 6; Jaffe, *supra*, pág. 19; Street, *supra*, págs. 8–9; Pugh *supra*, págs. 480–481.

Sin embargo, algunos años después de la ratificación de la Constitución, el Tribunal Supremo determinó en *Chisholm v. Georgia*, 2 U.S. 419 (1793), que un ciudadano de un estado podía demandar en daños a otro estado, en las cortes federales, por incumplimiento de contrato (*assumpsit*). Pugh, *supra*, pág. 483.

Esta decisión generó gran consternación entre los estados. En reacción a la misma, en 1794, fue propuesto el texto de la enmienda undécima y en 1798, ésta fue ratificada. Posteriormente el Tribunal Supremo hizo expre-

siones en las que reconoció la aplicabilidad de la doctrina a los estados. *Cohens v. Virginia*, 19 U.S. 264, 378 (1821).

En 1855 el Congreso adoptó el *Court of Claims Act*, 28 U.S.C. secs. 1491–1506 (1983). A través de esta ley, el Gobierno federal consintió a que se instaran procedimientos judiciales en su contra por reclamaciones fundadas en contratos, en las leyes o en la reglamentación federal. W.B. Wright, *The Federal Tort Claims Act: Analysed and Annotated*, Nueva York, Ed. Central Book Co., 1957, pág. 4.

En 1868 el Tribunal Supremo emitió tres (3) opiniones en las que justificó la adopción de la doctrina de la inmunidad soberana por ser una política pública fundamentada en la necesidad de proteger al Gobierno para que éste pueda realizar aquellas funciones que le son esenciales.

> Every government has an inherent right to protect itself against suits, and if, in the liberality of legislation, they are permitted, it is only on such terms and conditions as are prescribed by statute. The principle is fundamental, applies to every sovereign power, and but for the protection which it affords, the government will be unable to perform the various duties for which it was created. *Nichols v. United States*, 74 U.S. 122, 126 (1868). Véanse, además: *The Siren*, 74 U.S. 152, 153–154 (1868); *Gibbons v. United States*, 75 U.S. 269, 275 (1868).

En 1882 el Tribunal Supremo, en su opinión para el caso *United States v. Lee*, 106 U.S. 196, 205–209 (1882), parece abandonar sus anteriores declaraciones al atacar severamente la adopción de la doctrina de inmunidad soberana en Estados Unidos. Éste destacó que los fundamentos históricos y filosóficos de la misma son inconsistentes con el sistema democrático que estableció la Constitución.

> What were the reasons which forbid that the King should be sued in his own court, and how do they apply to the political body corporate which we call the United States of America? As regards to the King, one reason given by the old judges was the absurdity of the King's sending a writ to himself to command the King to appear in the King's court. No such reason exists in our government, as process runs in the name of the President,

and may be served on the Attorney–General, as was done in *Chisholm v. Georgia*, 2 Dall. 419. *United States v. Lee*, supra, pág. 206.

Under our system the *people*, who there called *subjects*, are the sovereign. Their rights, whether collective or individual, are not bound to give away to a sentiment of loyalty to a person of a monarch. The citizen here knows no person, however near to those in power or however powerful himself, to whom he need yield the rights which the law secures to him when it is well administered. When he, in one of the courts of competent jurisdiction, has established his right to property, there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using means which the law gives him for the protection and enforcement of that right. (Énfasis en el original .) *United States v. Lee*, supra, págs. 208–209.

Sin embargo, luego el Tribunal volvió a reconocer la doctrina en toda su extensión. En algunas ocasiones trata de justificar su adopción, *e.g.*, *Kawananakoa v. Polyblank*, 205 U.S. 349, 353 (1907); *The Western Maid*, 257 U.S. 419, 432–433 (1922). En otras meramente reconoce su existencia y virtualidad, pero no se preocupa por justificarla, *e.g.*, *Keifer and Keifer v. R.F.C.*, 306 U.S. 381, 388 (1939); *U.S. v. Shaw*, 309 U.S. 495, 500–501 (1940).

El *Court of Claims Act* no permitía que se demandara al Gobierno federal en daños y perjuicios por actuaciones de sus funcionarios. No es hasta 1946, con la aprobación del *Federal Tort Claims Act*, que el Congreso da su consentimiento para que se insten pleitos en daños:

against the United States, for money damages, .... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occured. 28 U.S.C. sec. 1346(b) (1983).

El consentimiento otorgado fue limitado y condicionado a ciertas causas de acción. La ley contiene una enumera-

ción de reclamaciones en las que el Estado conserva su inmunidad. 28 U.S.C. sec. 2680 (1994). Además, no existe límite monetario para las compensaciones que se pueden imponer contra el Estado.[10]

En resumen, la doctrina de la inmunidad soberana es un principio firmemente establecido en el derecho angloamericano. Ahora examinaremos el desarrollo de la misma en Puerto Rico.

## III

### Desarrollo de la doctrina en Puerto Rico

Durante los últimos años de la dominación española en Puerto Rico parece haber prevalecido el principio de la responsabilidad civil del Estado en algunas situaciones.[11] Sin embargo, con el cambio de soberanía llegó la doctrina de la inmunidad soberana.

Nos enfrentamos por primera vez a la controversia de si el Estado podía o no ser demandado sin haber dado su consentimiento para ello en *Rosaly v. El Pueblo et al*, 16 D.P.R. 508 (1910). Allí concluimos que procedía una demanda de reivindicación contra el Pueblo de Puerto Rico, aún cuando éste no había consentido a ser demandado, debido a que su consentimiento no era necesario por no ser un ente soberano. Íd., pág. 510. La soberanía residía en Estados Unidos. Además, el Acta Foraker no le concedió a Puerto Rico la protección de la inmunidad soberana. Íd., pág. 511. El Juez MacLeary emitió opinión disidente. Este interpretó que la Sec. 7 del Acta Foraker, 31 Stat. 77, Documentos Históricos, Sec. 7, L.P.R.A., Tomo 1, ed.1982, confirió a Puerto Rico el beneficio de la inmunidad soberana. *Rosaly v. El Pueblo et al*, supra, págs. 525–526. En *Díaz v.*

---

[10] Para una descripción más detallada del estatuto, véase Lee y Lindahl, *supra*, secs. 16.03–16.05.

[11] Véase la opinión disidente en parte y concurrente en parte del Juez Asociado Señor Rigau en *Galarza Soto v. E.L.A.*, supra, págs. 195–196.

*El Pueblo et al,* 17 D.P.R. 60, 64 (1911), se reiteró la inaplicabilidad de la doctrina.

La controversia sobre si la inmunidad soberana protege o no al Pueblo de Puerto Rico se presentó ante el Tribunal Supremo de Estados Unidos en *Porto Rico v. Rosaly,* 227 U.S. 270 (1913). El Tribunal revocó nuestra decisión en *Rosaly v. El Pueblo,* supra, y concluyó que Puerto Rico podía invocar la inmunidad soberana a su favor.

> It is not open to controversy that aside from the existence of some exception the government which the organic act established in Porto Rico is of such nature as to come within the general rule exempting a government sovereign in its attributes from being sued without its consent. *Porto Rico v. Rosaly,* supra, pág. 273.

De esta manera se incorporó por fíat judicial la doctrina de la inmunidad soberana en el Derecho puertorriqueño. *Alava e Iturregui v. Pueblo de Puerto Rico,* 20 D.P.R. 90, 91 (1914); *El Pueblo v. Neagle,* 21 D.P.R. 356, 358 (1914).

En 1916 se aprobó la primera ley que autorizó a que se instaran demandas contra el Estado. La Ley Núm. 76 de 13 de abril de 1916 (32 L.P.R.A. sec. 3061) permitió que se radicaran pleitos contra el Estado sólo en casos de reivindicación de bienes muebles o inmuebles o derechos sobre los mismos, y por daños y perjuicios fundamentados en contratos celebrados después de 1ro de julio de 1916, Leyes de Puerto Rico, págs. 155, 156–157. Esta ley no imponía un límite a la cuantía compensable.

Aunque este estatuto constituyó una renuncia a la inmunidad soberana, la misma fue parcial y limitada a las causas de acción que hemos expresado. Esta ley no permitía que se demandara al Estado por conducta torticera. Para ello se utilizó el mecanismo de las leyes especiales. En éstas, la Legislatura autorizaba a una persona en particular a incoar una demanda para reclamar daños por una actuación determinada de funcionarios del Estado. Véanse: S.P. Amadeo, *La responsabilidad civil del pueblo de Puerto*

*Rico: estudio de Derecho Público*, Río Piedras, Ed. U.P.R., 1944, págs. 38–44; *Meléndez v. E.L.A.*, supra, pág. 830, esc. 5; *Valiente y Cía. v. Pueblo*, 71 D.P.R. 646, 647–648 (1950).

La Ley Núm. 76, *supra*, fue enmendada en 1928 a los efectos de eliminar la limitación relativa a que las demandas por daños y perjuicios tenían que fundamentarse en obligaciones contractuales. La Ley Núm. 11 de 18 de abril de 1928 (32 L.P.R.A. secs. 3061–3064) autorizó demandas contra El Pueblo de Puerto Rico por reclamaciones de daños y perjuicios en general. Al igual que la Ley Núm. 76, *supra*, ésta no dispuso un límite a la cuantía compensable. 1928 Leyes de Puerto Rico 130–133.

En 1951 se volvió a enmendar la Ley Núm. 76, *supra*. El propósito de la enmienda fue conceder al Pueblo de Puerto Rico un término de veinte (20) días para formular su alegación. Ley Núm. 410 de 11 de mayo de 1951, Leyes de Puerto Rico, págs. 1092–1093; 32 L.P.R.A. sec. 3061.

La Convención Constituyente discutió, el 4 de enero de 1952, la deseabilidad de incluir en la Carta de Derechos de nuestra Constitución una sección de renuncia a la inmunidad soberana. Después de un amplio debate al respecto, los delegados rechazaron esta propuesta. 3 Diario de Sesiones de la Convención Constituyente 1527, 1530–1549 (1952). Más adelante examinaremos esto en detalle.

En 1955 se derogó la Ley Núm. 76, *supra*, y se aprobó en su lugar una nueva ley para autorizar reclamaciones y demandas contra el Estado, la Ley Núm. 104 de 29 de junio de 1955, Leyes de Puerto Rico, págs. 550–557; 32 L.P.R.A. secs. 3077–3084. Esta constituyó una amplia renuncia a la protección de la inmunidad soberana por parte del Estado. *Meléndez v. E.L.A.*, supra, pág. 827. En este estatuto, por primera vez, la Asamblea Legislativa dispuso un límite a la cuantía compensable contra el Estado. A estos efectos, en el Informe de la Comisión de lo Jurídico Civil se expresó

[la] Comisión cree que una legislación de esta naturaleza es altamente necesaria y deseable en Puerto Rico ya que la vieja

idea de que no se podía demandar al Estado sin su previo consentimiento se ha ido descartando. *No se ha querido conceder ilimitadamente autorización para demandar al Pueblo de Puerto Rico y se ha fijado esa autorización en una cuantía que no excederá $15,000 dólares.* (Énfasis suplido.) 3 Diario de Sesiones de la Asamblea Legislativa (Senado), Vol. VI, pág. 1787 (1955).

Además, se dispuso expresamente la responsabilidad vicaria del Estado por los daños ocasionados por sus empleados al actuar en capacidad oficial y dentro del marco de su función. Art. 2(a) de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3077(a). A estos efectos se enmendó también el Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5141. Art. 10 de la Ley Núm. 104, *supra*, 31 L.P.R.A. sec. 5142.

En 1965, mediante la Ley Núm. 111 de 30 de junio de 1965 (32 L.P.R.A. sec. 3077), se dispuso que cuando la acción u omisión de un funcionario cause daños a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la cantidad máxima compensable será treinta mil dólares ($30,000). 1965 Leyes de Puerto Rico 331.

En 1979 resolvimos el caso *Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979). Allí interpretamos el alcance del Art. 6(d) de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3081(d), que dispone excepciones a la renuncia de la inmunidad soberana del Estado, es decir, situaciones en las que el E.L.A. conserva su inmunidad.[12] Determinamos que el Estado responde al amparo de la Ley Núm. 104, *supra*, por actuaciones negligentes de sus funcionarios cuando "el elemento de negligencia o descuido en la actuación del agente

---

[12] "Nada en las secs. 3077 *et seq.* de este título ni en la sec. 5142 del Título 31 autoriza las acciones por daños y perjuicios contra el Estado por acto u omisión de un funcionario, agente o empleado:

"(d)constitutivo de acometimiento, agresión u otro delito contra la persona, encarcelación ilegal, arresto ilegal, persecución maliciosa, calumnia, libelo, difamación y falsa representación e impostura." Art. 6(d) de la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. sec. 3081).

supere cualquier grado de responsabilidad criminal presente en su conducta". *Galarza Soto v. E.L.A.*, supra, pág. 182. No consideramos la controversia relativa a la validez constitucional de la Ley. Íd., pág. 180 esc. 1. Sin embargo, las opiniones de los Jueces Asociados Señores Rigau, Díaz Cruz e Irizarry Yunqué atendieron este asunto.

En su opinión disidente en parte y concurrente en parte, el Juez Asociado Señor Rigau, luego de exponer ampliamente el trasfondo histórico y desarrollo de la doctrina de inmunidad soberana, sostuvo que la misma es inconstitucional. Esto, por constituir una violación del principio de la igual protección de la ley "al establecer que se pueden recobrar daños causados por particulares y no los causados por el Estado ... esa *clasificación carece de base racional*, lo cual también la hace inconstitucional". (Énfasis suplido.) *Galarza Soto v. E.L.A.*, supra, págs. 201–202. Además, expresó que la doctrina viola uno de los principios generales del Derecho, la equidad. Íd.

El Juez Asociado Señor Irizarry Yunqué declaró, en su opinión particular, que la ley es inconstitucional por violar la igual protección de las leyes y la cláusula del debido proceso de ley al impedir o limitar el acceso a los tribunales a las personas a quienes el Estado causa daño. *Galarza Soto v. E.L.A.*, supra, págs. 206–210. Además, sostuvo que la inmunidad soberana es contraria a nuestro ordenamiento constitucional. Íd., pág. 205.

En su opinión concurrente, el Juez Asociado Señor Díaz Cruz señaló que la ley no adolece de vicio constitucional alguno. "En nuestro medio, donde tanto el Estado, como sus funcionarios, como los propios terceros perjudicados en general son parcos en recursos, debemos evadir la solución drástica y optar por un adecuado aumento en los límites de responsabilidad, acción que corresponde a la Asamblea Legislativa. La moderación que representa la limitación de cuantías y la exclusión de ciertas acciones por el Art. 6 de la Ley Núm. 104, de 29 junio de 1955 (32 L.P.R.A. secs.

3077 y 3081), no contraviene el debido proceso ni niega la igual protección de las leyes." *Galarza Soto v. E.L.A.*, supra, págs. 203–204.

Estas opiniones en *Galarza Soto v. E.L.A.*, supra, son las primeras manifestaciones de miembros de este Tribunal relativas a la constitucionalidad de la Ley Núm. 104, *supra.* Sólo dos (2) años después se nos presentó otra vez esta controversia.

En *Torres v. Castillo Alicea*, 111 D.P.R. 792 (1981), se nos cuestionó la constitucionalidad de los Arts. 2(a), (c) y 7 de la Ley Núm. 104, *supra*, 32 L.P.R.A. secs. 3077(a), 3077(c) y 3082.([13]) Allí sostuvimos que los mismos eran in-

---

([13]) El texto de esos artículos, en aquel momento, era el siguiente:

"Se autoriza demandar al Estado Libre Asociado de Puerto Rico, ante el Tribunal de Primera Instancia de Puerto Rico por las siguientes causas:

"(a)Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de $15,000 causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia. Cuando por tal acción u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de $30,000. Si de las conclusiones del Tribunal surgiera que la suma de los daños causados a cada una de las personas excede de $30,000, el Tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. Cuando se radique una acción contra el Estado por daños y perjuicios a la persona o a la propiedad, el Tribunal ordenará, mediante la publicación de edictos en un periódico de circulación general, que se notifique a todas las personas que pudieran tener interés común, que deberán comparecer ante el Tribunal, en la fecha dispuesta en los edictos, para que sean acumuladas a los fines de proceder a distribuir la cantidad de $30,000 entre los demandantes, según se provee en esta ley.

"(c)Acciones civiles en que la cuantía reclamada no exceda de $15,000 de principal, y que se funden en la Constitución, o en cualquier ley de Puerto Rico, o en cualquier reglamento de algún departamento o división del Estado, o en algún contrato expreso o tácito con el Estado." Art. 2(a) y (c), 32 L.P.R.A. secs. 3077(a) y 3077(c).

"El Estado satisfará prontamente cualquier fallo en su contra hasta el máximo señalado en la sec. 3077 de este título. Si se tratase del pago de una suma de dinero y no fuere posible hacerlo por no existir fondos a tal fin en el presupuesto corriente, se hará la correspondiente asignación de fondos para su pago en la parte del presupuesto general de gastos del siguiente año del departamento o agencia correspondiente. Para ejercitar una causa de acción de las contenidas en los incisos (a) y(c) de la sec. 3077 de este título, por una suma mayor que la allí autorizada y para pagar el exceso de una sentencia sobre dichas sumas, será preciso obtener autorización legislativa específica." Art. 7 (32 L.P.R.A. sec. 3082) (ed.1968).

constitucionales por violar la garantía de la igual protección de las leyes y el principio de separación de poderes. *Torres v. Castillo Alicea*, supra, págs. 798 y 803. El esquema creado por la ley promovía la impermisible intromisión de la Asamblea Legislativa en el proceso judicial a través de dispensas de las cuantías máximas de compensación dispuestas por el citado Art. 2. Determinamos que esto constituía una violación del principio de separación de poderes, pues los afectados por una sentencia limitada a la cuantía máxima compensable recurrían a la Legislatura para que ésta les eximiera de la misma. De esta manera podían recibir compensación de acuerdo a las cantidades calculadas por el tribunal sentenciador a base de la prueba desfilada.[14] Declaramos que este esquema constituía una violación patente del principio de separación de poderes.

> El resultado es nefasto. La sentencia del tribunal que ha evaluado y adjudicado los derechos de las partes, permanecerá incumplida sujeta a que la Asamblea Legislativa le insufle energía ejecutiva. Es decir, que el fallo judicial dependerá para su virtud y eficacia de la acción de la Asamblea Legislativa, y aun así en la óptima posibilidad de que el demandante victorioso logre la intervención de la Rama Legislativa a su favor. En último análisis queda una sentencia judicial sujeta y condicionada en su valor a que otra rama del gobierno le imparta su aprobación, todo ello en contravención del principio de separación de poderes. *Torres v. Castillo Alicea*, supra, pág. 803.

Además, la disponibilidad de la dispensa legislativa provocaba una violación a la garantía de la igual protección de las leyes. Al no existir criterios de elegibilidad, ésta sólo beneficiaba a aquellos capaces de obtener el favor legislativo. De esta manera creaba un trato desigual

---

[14] "[C]onviene observar que en las acciones bajo este estatuto los Jueces Superiores deben determinar la cuantía de daños que resulte de acuerdo con la prueba, aun cuando pudiere exceder de $15,000, y dictar sentencia sujeto al límite si fuere mayor. Debe ser así ya que la propia Ley 104 permite que se obtenga autorización legislativa específica para pagar el *exceso* de una sentencia sobre dicho límite." (Énfasis en el original.) *Vda. de Valentín v. E.L.A.*, 84 D.P.R. 112, 122–123 (1961).

impermisible. *Torres v. Castillo Alicea*, supra, págs. 798–799.

La declaración de inconstitucionalidad del Art. 2 de la Ley Núm. 104, *supra*, responde al análisis de que los límites a la cuantía compensable provocaban que los perjudicados acudieran al mecanismo de la dispensa legislativa. Así declaramos que el ente generador del vicio constitucional, entiéndase por el vicio la dispensa legislativa, eran los límites económicos impuestos por la ley. Sin embargo, en esta opinión no se hizo un análisis constitucional de los límites en sí. Por el contrario, nos expresamos a favor de su utilización dentro de ciertas circunstancias.

> Hasta ahora habíamos visto en los modestos límites económicos del estatuto un instrumento de protección del erario público contra reclamaciones gigantescas, *mas la continuada práctica de dispensa especial por acción legislativa que vulnera el principio de igualdad y trato justo en la aplicación de las leyes*, unida a la desvalorización de la moneda, al impulso de fuerzas inflacionarias a que hemos hecho referencia nos insta a declarar el Art. 2(a) de la Ley Núm. 104 de 1955 citada, en contravención y conflicto con el Art. II sec. 7 de nuestra Constitución de 1952 en su categórica afirmación: "Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes." El vicio constitucional de la estructura nace de los límites económicos irreales que dan lugar a trato especial para algunos litigantes favorecidos por leyes de privilegio. *El Estado puede limitar su responsabilidad civil al dar su consentimiento para ser demandado si dicha limitación guarda un justo balance entre el interés privado y el legítimo interés del Estado en proteger los recursos públicos y se provee igualdad en el acceso a la fuente de compensación.* (Énfasis suplido.) *Torres v. Castillo Alicea*, supra, págs. 799–800.

En resumen, la declaración de inconstitucionalidad que se hizo en *Torres v. Castillo Alicea*, supra, respondió al análisis y a la determinación de que la dispensa legislativa violaba los principios de separación de poderes e igualdad ante la ley. Los límites económicos fueron declarados inconstitucionales, por ser ellos la razón que dirigía los perjudicados a acudir al mecanismo de dispensa. Pero la opi-

nión no consideró la controversia sobre la constitucionalidad de los límites en particular. Éstos no se examinaron a base de la metodología de análisis de las protecciones constitucionales de igualdad ante la ley y debido proceso sustantivo. Por lo tanto, *Torres v. Castillo Alicea*, supra, no dispuso del asunto relativo a si el diseño legislativo de límites a la cuantía máxima compensable es inconstitucional.

En *Colón v. Municipio de Guayama*, 114 D.P.R. 193 (1983), examinamos la validez constitucional del Art. 96–A de la Ley Municipal, 21 L.P.R.A. ant. sec. 1603a. Esta disposición era similar a los Arts. 2(a), (c) y 7 de la Ley Núm. 104, *supra*, que fueron declarados inconstitucionales en *Torres v. Castillo Alicea,* supra.[15] Utilizamos el mismo análisis de *Torres v. Castillo Alicea*, supra, en cuanto a la inconstitucionalidad de la dispensa legislativa, para declarar que la dispensa que articulaba la Ley Municipal también

---

[15] "Las reclamaciones contra los municipios, por daños y perjuicios a la persona o a la propiedad, causados por culpa o negligencia de la corporación municipal, no podrán exceder de la cantidad de quince mil (15,000) dólares. Cuando por una misma actuación u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder la suma de treinta mil (30,000) dólares. Si de las conclusiones del Tribunal surgiera que la suma de los daños causados a cada una de las personas excede de treinta mil (30,000) dólares, el Tribunal procederá a distribuir dicha suma de treinta mil (30,000) dólares entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. Cuando se radique una acción contra cualquier municipio, de acuerdo con los términos de este artículo, el Tribunal ordenará que se notifique, mediante la publicación de edictos en un periódico de circulación general, a todas las personas que pudieren tener interés común, que deberán comparecer ante el Tribunal, en la fecha dispuesta en los edictos, para que sean acumuladas, a los fines de proceder a distribuir la cantidad de treinta mil (30,000) dólares entre los demandantes, según se provee en esta sección.

"Para poder reclamar por sumas mayores que las anteriormente dispuestas, o para que el Tribunal pueda adjudicar dichas sumas mayores, será necesario el consentimiento de la Asamblea Municipal, por dos terceras (2/3) partes de sus miembros, expresado mediante ordenanza o resolución al efecto, en la cual se consignarán las razones que justifican tal consentimiento.

"Nada de lo aquí dispuesto impedirá que la Asamblea Legislativa autorice cualquier reclamación contra cualquier municipio, por sumas mayores de las antes mencionadas, cuando en el interés de la justicia así lo estime conveniente." Art. 96–A de la Ley Núm. 119 de 24 de junio de 1966 (21 L.P.R.A. ant. sec. 1603a).

adolecía de vicio constitucional. Véase *Colón v. Municipio de Guayama*, supra, págs. 200–201.

Al igual que en *Torres v. Castillo Alicea*, supra, los límites económicos que disponía la Ley Municipal también fueron declarados inconstitucionales, pero sin ser objeto de un análisis particularizado. Tampoco se utilizó en esta ocasión la metodología de análisis correspondiente a las garantías de la igual protección de las leyes y del debido proceso de ley. La declaración de inconstitucionalidad de los límites económicos fue secuela forzada de la inconstitucionalidad de la dispensa.

En respuesta a la decisión de *Torres v. Castillo Alicea*, supra, la Legislatura enmendó la Ley Núm. 104, *supra*. Mediante la Ley Núm. 30 de 25 de septiembre de 1983 (31 L.P.R.A. secs. 743–744) se aumentaron los límites a la cuantía compensable. El límite por una causa de acción aumentó de quince mil dólares ($15,000) a setenta y cinco mil dólares ($75,000), y de treinta mil dólares ($30,000) a ciento cincuenta mil dólares ($150,000), en casos de un reclamante con varias causas de acción o varios reclamantes. Además, se eliminó el mecanismo de la dispensa legislativa.

■ La Asamblea Legislativa amparó su actuación en declaraciones de *Torres v. Castillo Alicea*, supra, relativas a la validez de los límites económicos en algunas circunstancias.

El Tribunal Supremo de Puerto Rico resolvió en ese mismo caso que "el Estado puede limitar su responsabilidad civil al dar su consentimiento para ser demandado si dicha limitación guarda un justo balance entre el interés privado y el legítimo interés del Estado en proteger los recursos públicos y se provee igualdad en el acceso a la fuente de compensación. Con estos criterios en mente, se adopta esta pieza legislativa". 1983 Leyes de Puerto Rico 455.

Hemos interpretado que la Ley Núm. 30, *supra*, es de efecto prospectivo. *Rodríguez Ríos v. E.L.A.*, 116 D.P.R.

102, 106 (1985); *Arce Oliveras v. E.L.A.*, 122 D.P.R. 877 (1988).

Como ya señalamos, este Tribunal nunca ha examinado específicamente una controversia relativa a los límites económicos que dispone la Ley de Reclamaciones y Demandas contra el Estado. Nuestras opiniones en *Torres v. Castillo Alicea*, supra, y *Colón v. Municipio de Guayama*, supra, no entraron a considerar de manera particular la controversia que tenemos ante nos. Por lo tanto, éstas no pueden ser invocadas como precedente ineludible en este caso. Procederemos, pues, a considerar los reclamos constitucionales que los recurrentes esgrimen contra los límites que la ley impone.

## IV

*Examen sobre la constitucionalidad de los artículos 2 y 7 de la Ley Núm. 104, segun enmendada*

Los recurrentes presentan tres (3) argumentos en apoyo a su señalamiento de error relativo a la inconstitucionalidad de los artículos referentes a la cuantía máxima compensable bajo la Ley Núm. 104, según enmendada, *supra*. Estos exponen, en primer lugar, que la doctrina de la inmunidad soberana, según articulada por la ley, es contraria a nuestro ordenamiento constitucional por ser su origen histórico ajeno a nuestro sistema democrático. En segundo lugar, señalan que el Art. 2 de la Ley Núm. 104, *supra*, crea un discrimen inconstitucional que violenta la garantía de la igual protección de las leyes. Finalmente, sostienen que la disposición estatutaria en cuestión es arbitraria y constituye una violación del debido proceso de ley en su vertiente sustantiva. Examinaremos estos argumentos en este mismo orden.

A. Los recurrentes señalan que la doctrina de la inmunidad soberana es inconsistente con nuestro ordenamiento constitucional por razón de su origen histórico y filosófico.

Ellos sostienen que al disponer nuestra Constitución que la soberanía reside en el Pueblo,(16) el Estado no puede estar inmune a reclamaciones en su contra. El derecho a demandarle está implícito en la soberanía del Pueblo. Además, alegan que la reserva de derechos dispuesta por el Art. II, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1,(17) incluye el derecho de cada ciudadano para reclamarle al Estado por los daños que éste le cause.

Según expresamos anteriormente, durante la Convención Constituyente el asunto de la inmunidad soberana fue objeto de amplio debate. Se presentaron tres (3) proyectos dirigidos a incluir en la Carta de Derechos una sección de renuncia a la inmunidad soberana del E.L.A.(18) La pro-

---

(16) "Que entendemos por sistema democrático aquel donde *la voluntad del pueblo es la fuente del poder público*, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas ...." (Énfasis suplido.) Preámbulo, Const. E.L.A., L.P.R.A., Tomo 1, ed.1982, pág. 251.

"Se constituye el Estado Libre Asociado de Puerto Rico. *Su poder político emana del pueblo y se ejercerá con arreglo a su voluntad*, dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América." (Énfasis suplido.) Art. I, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed.1982, pág. 252.

(17) "La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo." Art. II, Sec. 19, Const. E.L.A., L.P.R.A.; Tomo 1, ed.1982, pág. 332.

(18) El texto de los proyectos presentados es el siguiente:

"Toda persona puede demandar al Estado o a cualquier entidad pública en los casos, en la forma y dentro de los límites que se disponga por ley, por daños sufridos como consecuencia de actos ilegales o negligentes de cualquier funcionario público en el desempeño de su cargo.

"El Pueblo de Puerto Rico, sus agencias y municipios, serán responsables de los perjuicios que causen sus funcionarios o empleados a las personas o bienes de éstas por cualquier daño que surja de la culpa o negligencia por funcionarios o empleados en el desempeño de sus funciones.

"Salvo los casos en que por razones de interés público por ley hubieren sido excluidos, el Estado siempre que por medio de un funcionario público o empleado actuando en el desempeño de sus funciones, causare daño a una persona natural o jurídica por acción u omisión ilegales o que intervenga culpa o negligencia, estará obligado a indemnizar el daño causado. De no hacerlo podrá ser demandado ante los tribunales de justicia en la misma forma que un ciudadado particular." 3 Diario de Sesiones, *supra*, págs. 1530, 1547.

puesta para una renuncia absoluta no fue adoptada. 3 Diario de Sesiones, *supra*, pág. 1530.

El debate giró primordialmente sobre el tema del impacto económico de la renuncia en el fisco. 3 Diario de Sesiones, *supra*, págs. 1539, 1540, 1545 y 1546. La mayoría de los delegados que se expresaron, abogaron por una renuncia condicionada y que la Asamblea Legislativa dispusiera el alcance de la misma. Íd., págs. 1531, 1532 y 1535. Los delegados manifestaron que la Legislatura, en el ejercicio de su poder de reglamentación, debe determinar los casos de responsabilidad del Estado y la magnitud de ésta. Íd., págs. 1543, 1544 y 1545. Además, sostuvieron que la Asamblea Legislativa tenía esa facultad antes del establecimiento de la Constitución, y que la continuaría teniendo aun cuando no se aprobara sección alguna sobre renuncia de la inmunidad soberana. Íd., págs. 1534, 1535 y 1543.

> SR. REYES DELGADO: ¿Actualmente sin que se escriba en la Constitución el precepto, tal como lo ha consignado en su enmienda el representante Font Saldaña, puede la [Asamblea] Legislativa determinar que puede demandarse al Estado en daños y perjuicios?
>
> SR. TRIAS MONGE: *No cabe duda*, pero si se expone el principio en la constitución de que no es inmune el Estado, sino que es responsable al individuo por todo daño y perjuicio ocasionado, por actos ilegales o negligentes de funcionarios públicos, entonces quedaría impedida definitivamente la [Asamblea] Legislativa de establecer excepciones a ese principio. *Lo [que] queremos hacer claro, es que el establecimiento del principio de responsabilidad pública, en forma alguna limita el derecho de la Asamblea Legislativa establecer las excepciones a excluir las acciones que se estime conveniente y a imponer las garantías procesales necesarias para la implementación de ese principio.* (Énfasis suplido.) 3 Diario de Sesiones, *supra*, pág. 1535.

El examen del Diario de Sesiones de la Convención Constituyente nos permite llegar a las siguientes conclusiones. El propósito de la proyectada sección sobre renuncia de inmunidad soberana no era establecer la responsabilidad absoluta del E.L.A. Por el contrario, los delegados se manifestaron a favor de que la Asamblea Legisla-

tiva conservara su poder para disponer las condiciones de esta renuncia. 3 Diario de Sesiones, *supra*, pág. 1543. Entre estas condiciones se incluía determinar el remedio a concederse en casos de responsabilidad del Estado. Íd., pág. 1534. Las manifestaciones de los delegados, junto a su acción al derrotar los proyectos de sección presentados, nos permiten concluir que los redactores de nuestra Constitución no encontraron inconsistencia alguna entre ésta y el principio de la inmunidad soberana. Del estudio del debate se deduce claramente que la posición mayoritaria en la Convención era a favor de la renuncia condicionada de la inmunidad según fuera ésta dispuesta por la Asamblea Legislativa en el ejercicio de su amplio poder de reglamentación. Siendo ésta la intención de los constituyentes, los argumentos de los recurrentes no pueden prevalecer.

 De igual manera, su alegación relativa al Art. II, Sec. 19 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, carece de méritos. El propósito de la primera oración de esta sección es permitir que se puedan incorporar en la Constitución, "tanto derechos derivables, ya o más tarde, de los expresamente enumerados, como nuevos derechos que fuesen adquiriendo reconocimiento a través de los años". J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. 3, pág. 208. Carece de toda lógica argumentar que esta sección reconoce implícitamente un derecho a demandar al Estado por los daños que éste cause, cuando los delegados de la Convención Constituyente rechazaron de manera expresa proyectos que disponían la responsabilidad civil del Estado.

B. Como segundo argumento, los recurrentes señalan que los límites a las cuantías compensables son inconstitucionales porque establecen un trato desigual impermisible en violación a la garantía de la igual protección de las leyes de nuestra Constitución. Esto es por razón de dos (2) clasificaciones que dispone la ley. En primer lugar, se distin-

gue entre reclamaciones por daños y perjuicios a base de quien sea el responsable por los mismos. Si es el Estado, los perjudicados serán compensados hasta los límites fijados por la ley. Si es un ente privado, se compensa la totalidad de los daños. En segundo lugar, se hace distinción entre aquellos perjudicados cuyos daños exceden los límites dispuestos por la ley y los que sus daños no exceden éstos. A los primeros no se les resarcirá totalmente, mientras que a los segundos sí.

■ La Sec. 7 de nuestra Carta de Derechos dispone que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7 Const. E.L.A., L.P.R.A., Tomo 1, ed.1982, pág. 275. Esta disposición no exige un trato igual para todos. Lo que prohíbe es el trato desigual injustificado. Se pueden establecer diferencias en el trato si éstas tienen una justificación objetiva. *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102 (1991); *Almodóvar v. Méndez Román*, 125 D.P.R. 218 (1990); *Salas v. Municipio de Moca,* 119 D.P.R. 625, 632 (1987); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 332 (1987). "El Estado puede hacer clasificaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo. El problema consiste en dictaminar cuando la clasificación es razonable o no." *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975). A estos fines, se requiere determinar primero cuál criterio se utilizará para examinar la razonabilidad de la clasificación en controversia. *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 260 (1980).

■ Existen tres (3) criterios para determinar la razonabilidad de una clasificación a la luz de la cláusula de la igual protección de las leyes. Éstos son, el escrutinio estricto o examen minucioso, el intermedio y el tradicional mínimo o de nexo racional. *Vélez v. Srio. de Justicia*, 115

D.P.R. 533, 537 (1984); *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980).

El escrutinio estricto dispone el análisis más riguroso de la ley. Se utiliza cuando ésta presenta una clasificación sospechosa. Las clasificaciones sospechosas son aquellas que se establecen por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992). También se utiliza este escrutinio cuando la ley infringe derechos fundamentales. Entre los derechos fundamentales se han reconocido el derecho al voto, a la libertad de culto, a la libertad de expresión, a la vida, a la protección de ley contra ataques abusivos a la honra y el derecho a la intimidad. Íd. Al utilizar este escrutinio se presume la inconstitucionalidad de la ley. El Estado tiene el peso de probar que existe un interés público apremiante que justifique la clasificación y que ésta promueve necesariamente la consecución de ese interés. Íd.

El escrutinio intermedio se utiliza cuando la clasificación legislativa afecta "intereses individuales importantes, aunque no sean necesariamente fundamentales, y el uso de criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos". *León Rosario v. Torres*, supra, pág. 814. Bajo este escrutinio se requiere que la clasificación adelante un interés gubernamental legítimo y que esté sustancialmente relacionada con el mismo. 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.3, págs. 326–327 (1986). El escrutinio intermedio ha sido utilizado por el Tribunal Supremo de Estados Unidos en casos relativos a clasificaciones fundamentadas en sexo, nacimiento y extranjería. Íd. Nosotros nunca lo hemos utilizado. *Almodóvar v. Méndez Román*, supra, pág. 254 esc. 24.

Finalmente, el escrutinio de nexo racional es el más leniente. Este se utiliza primordialmente para legisla-

ción de tipo socioeconómico. *Salas v. Municipio de Moca*, supra, pág. 632; *M. & B.S., Inc. v. Depto. de Agricultura*, supra, págs. 332, 333; *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456, 461 (1980). Al examinar una ley bajo este escrutinio, se presume su constitucionalidad. Por lo tanto, quien alega su inconstitucionalidad tiene el peso de probarla. *Zachry International v. Tribunal Superior*, supra, pág. 277. Este escrutinio dispone que una clasificación legislativa no será declarada inválida "a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado". *Vélez v. Srio. de Justicia*, supra, pág. 538. Por lo tanto, se mantendrá la constitucionalidad de la ley si puede concebirse razonablemente una situación de hechos que justifique la clasificación. *Rodríguez v. E.L.A.*, supra.

Los recurrentes sostienen que en este caso debe utilizarse el escrutinio estricto, pues alegan que la clasificación afecta derechos fundamentales. En este sentido, exponen que la legislación infringe los derechos siguientes:

1) el derecho a llevar una acción civil, y
2) el derecho a pedir al Gobierno la reparación de agravios. Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

Alegan los recurrente que el derecho a llevar una acción civil fue reconocido por este Tribunal en *Torres v. Castillo Alicea*, supra. Además, sostienen "que el derecho a llevar una causa de acción conlleva el de obtener un remedio, de lo contrario el mismo no tendría ningún efecto en nuestra sociedad". Solicitud de revisión, RE-90-371, pág. 21.

El Tribunal Supremo de Estados Unidos no ha reconocido que exista un derecho de acceso a los procedimientos judiciales per se. Lo que ha establecido es que los estados no pueden denegar este acceso cuando ello implica la privación de un derecho constitucional fundamental. *Treatise on Constitutional Law*, supra, pág. 305. Esta controversia ha surgido principalmente por razón de leyes que

disponen el pago de derechos de presentación (*filing fees*) para poder instar un procedimiento judicial. Dichas leyes han sido impugnadas por personas que, por razones de pobreza, no han podido pagar los derechos y se han visto impedidos de instar reclamaciones judiciales.

En *Boddie v. Connecticut*, 401 U.S. 371 (1971), el Tribunal Supremo decidió que el requisito de pago de derechos de presentación para procedimientos de divorcio no se podía aplicar a indigentes, porque ello impedía que ejercieran su derecho constitucional a seleccionar con quién casarse. Esto debido a que la única manera de obtener un divorcio es a través de un procedimiento judicial. El Tribunal resolvió que el derecho de acceso a los procedimientos judiciales no es absoluto. Además, éste sólo existe cuando denegar el acceso a los tribunales impide el ejercicio de un derecho fundamental.

> We do not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual, for, as we have already noted, in the case before us this right is the exclusive precondition to the adjustment of a fundamental human relationship. Íd., págs. 382–383.

De igual manera en *Little v. Streater*, 452 U.S. 11 (1981), el Tribunal aplicó la norma de *Boddie* a casos de filiación por su carácter fundamental. Sin embargo, en *United States v. Kras*, 409 U.S. 434, 444–445 (1973), y en *Ortwein v. Schwab*, 410 U.S. 656, 659 (1973), se negó a reconocer el derecho de acceso a procedimientos judiciales, para casos de quiebras y en revisiones judiciales de decisiones administrativas relativas a programas de beneficencia social, por no haber intereses fundamentales involucrados. Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Sec. 16-11, pág. 1462. Por lo tanto, el derecho de acceso a los tribunales no es absoluto. Sólo existe cuando denegar el acceso priva a la persona del ejercicio de un derecho

fundamental. En ausencia de derecho fundamental alguno no se puede invocar el mismo.

Además, en los casos en los que existe, únicamente garantiza que la persona no será impedida de ejercer un derecho fundamental si la única manera de ejercerlo es a través de un procedimiento judicial. Lo que el derecho garantiza es que la reclamación será adjudicada judicialmente. No garantiza remedios.

> The right of access to court cannot, of course, be equated with a right to be free of all sustantive legal obstacles to particular forms of recovery: substantive defenses and immunities to a claim may be recognized by the state without a constitutional violation. Tribe, *op. cit.*, Sec. 10-18, pág. 755.

El Tribunal Supremo ha declarado que los estados pueden establecer la defensa de inmunidad y, por lo tanto, eliminar remedios siempre que ello no sea irrazonable ni arbitrario. *Martinez v. California*, 444 U.S. 277, 282 (1980). Véase, además, *Ferri v. Ackerman*, 444 U.S. 193, 198 (1979).

A los recurrentes en este caso no se les negó el acceso a los procedimientos judiciales. Sus reclamaciones fueron adjudicadas en los tribunales. Ellos lo que reclaman es un remedio particular, la total compensación de sus daños. El derecho de acceso a los procedimientos judiciales, según articulado por el Tribunal Supremo federal, no les cobija en este reclamo.

■ Además, señalan los recurrentes que el derecho a llevar una acción civil se estableció implícitamente en el caso de *Torres v. Castillo Alicea*, supra, al citar con aprobación un pasaje del libro *American Constitutional Law* del tratadista Tribe. En *Torres v. Castillo Alicea*, supra, no hay declaración alguna en el sentido de que se reconocía la existencia de un derecho fundamental a llevar una acción civil. Es en *Alicea v. Córdova*, 117 D.P.R. 676, 690 (1986), donde se señala que "el derecho a llevar una acción civil es un derecho fundamental y cualquier clasificación legisla-

tiva que afecte este derecho tendrá que resistir el análisis de estricto escrutinio judicial". Sin embargo, estas expresiones no constituyeron opinión de este Tribunal.[19] En nuestra jurisdicción no se ha reconocido un derecho fundamental a llevar una acción civil. Por lo tanto, la alegación relativa a que la Ley Núm. 104, *supra*, infringe este derecho carece de méritos.

Los recurrentes también alegan que las clasificaciones impugnadas violentan el derecho constitucional a pedir al Gobierno la reparación de agravios. Art. II, Sec. 4, Const. E.L.A., *supra*. Sostienen que el alegado derecho a obtener un remedio "está comprendido por la disposición constitucional que garantiza el derecho a solicitar la reparación de agravios, siendo este derecho de tal jerarquía no sería posible bajo nuestro esquema constitucional permitir una legislación discriminatoria contra unos, impidiéndoles el acceso a la reparación total de unos daños, mientras permite que otros si pueden [sic] ser resarcidos totalmente".

La Constitución del E.L.A. dispone que "[n]o se aprobará ley alguna que restrinja ... el derecho del pueblo ... a pedir al gobierno la reparación de agravios". Art. II, Sec. 4, Const. E.L.A., *supra*.[20] Existe una disposición análoga en la enmienda primera de la Constitución de Estados Unidos. "Congress shall make no law... abridging... the right of the people... to petition the Government for a redress of grievances." Const. E.E.U.U., Enmienda I, Constitution Amendments, U.S.C., 1987.

Los delegados a nuestra Convención Constituyente aprobaron esta sección con el propósito de incorporar en la Constitución de E.L.A. una disposición similar a la federal y con ella su jurisprudencia interpretativa. En este sentido

---

[19] Las partes I y III de la opinión obtuvieron el voto de conformidad de cuatro (4) jueces. La parte II, en la que aparecen las declaraciones citadas, sólo obtuvo el voto de tres (3) jueces. Por no obtener el voto de conformidad de la mayoría ésta no formó parte de la opinión del Tribunal.

[20] Para disposiciones previas, véase Ley de 27 de febrero de 1902 (1 L.P.R.A. sec. 12); Acta Jones, 39 Stat. 951, Documentos Históricos, Sec. 2, L.P.R.A., Tomo 1.

se declaró en el *Informe de la Comisión de Carta de Derechos*, "[e]sta sección corresponde a las restantes disposiciones de la enmienda primera en la Constitución federal e incorpora a nuestra constitución todo el derecho históricamente establecido con relación a la libertad de palabra, de prensa, de reunión y de petición". Diario de Sesiones, *supra*, pág. 2564. Véanse, además: 2 Diario de Sesiones, *supra*, págs. 1104, 1448; 4 Diario de Sesiones, *supra*, págs. 2401, 2447.

Durante la Convención se presentó, además, la siguiente enmienda para ampliar significativamente "el derecho de petición".

> Todo ciudadano residente en Puerto Rico tendrá derecho a demandar judicialmente para compeler el cumplimiento de esta constitución, de las leyes que en virtud de esta ley se aprobaren, así como para impedir el uso ilegal de los fondos públicos.
> *El derecho de petición queda garantizado y no podrá discriminarse contra la persona o personas que* favorezcan, propulsen o *presenten solicitudes para el resarcimiento de daños*, para la remoción de funcionarios públicos, para la adopción, revocación, enmienda o reglamentación de cualquiera leyes, ordenanzas o reglamentaciones, o sobre otras cuestiones de gobierno.
> *Toda persona tiene derecho a un recurso efectivo que la ampare contra actos que violen sus derechos fundamentales reconocidos por la constitución o por la ley.* (Énfasis suplido.) 2 Diario de Sesiones, *supra*, págs. 1448–1449.

El proyecto prohibía el discrimen contra personas que solicitarán el resarcimiento de daños. Además, garantizaba el derecho a un recurso efectivo contra violaciones de derechos fundamentales. Sin embargo, este proyecto fue derrotado. 2 Diario de Sesiones, *supra*, pág. 1449. Véase Trías Monge, *op. cit.*, Vol. 3, pág. 184.

Del examen del *Diario de Sesiones* podemos concluir que la intención de los delegados fue incorporar en nuestra Constitución el derecho a pedir la reparación de agravios, según aparece en la primera enmienda de la Constitución federal junto a su jurisprudencia interpretativa. Además,

los delegados se negaron a ampliar el alcance de este derecho al rechazar la enmienda que hemos señalado. Es pues patente que no era su intención reconocer un derecho de acceso a los procedimientos judiciales independiente del derecho a pedir la reparación de agravios. Por otro lado, se rechazó la prohibición contra el discrimen en contra de personas que solicitasen el resarcimiento de daños. Debido a que los delegados se negaron a conceder mayores garantías que las dispuestas por la Constitución federal, procede que examinemos si a los recurrentes se les ha violado su derecho a pedir al gobierno la reparación de agravios, según éste ha sido interpretado por el Tribunal Supremo federal.

El origen del derecho a pedir al Gobierno la reparación de agravios se remonta a la Carta Magna. *Treatise on Constitutional Law*, supra, Vol. 3, pág. 293. De allí pasó a la ·Constitución federal en 1791. Nota, *A First Amendment Right of Access to the Courts for Indigents*, 82 Yale L.J. 1055, 1059 (1973).

Al analizar este derecho, el Tribunal Supremo lo ha considerado estrechamente ligado a los demás derechos de primera enmienda, especialmente al de asociación. *United States v. Cruikshank et al.*, 92 U.S. 542, 552 (1875); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937); *Thomas v. Collins*, 323 U.S. 516, 530 (1945). El derecho ·a pedir al Gobierno la reparación de agravios y los demás derechos de la primera enmienda se considera que van dirigidos a un mismo propósito: garantizar la más amplia libertad de expresión. *Treatise on Constitutional Law*, supra, Vol. 3, pág. 295. Véase *Osborn v. Pennsylvania Delaware Serv. Station*, 499 F. Supp. 553, 556 (D. Del. 1980).

El Tribunal ha interpretado que el derecho a solicitar la reparación de agravios incluye acudir a los tribunales con ese propósito. Las primeras expresiones sobre el particular se hicieron en el contexto del derecho de asociación al refrendar la práctica de uniones obreras que contrataban o le recomendaban abogados a sus miembros para que les lle-

varan casos relacionados con el empleo. *Railroad Trainmen v. Virginia Bar*, 377 U.S. 1, 7 (1964); *Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217, 222 (1967).

Jurisprudencia posterior ha reconocido que el derecho a pedir la reparación de agravios tiene eficacia independiente del derecho de asociación. El Tribunal ha manifestado, en situaciones en las que no está involucrado el derecho de asociación, que el acceso a los tribunales es un elemento del derecho a pedir la reparación de agravios.

> The right of access to the court is indeed but one aspect of the right of petition. *California Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *Bill Johnson's Restaurant, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

También ha declarado que una de las maneras de ejercer este derecho es instando pleitos en los tribunales. Sin embargo, no existe manifestación alguna del Tribunal Supremo federal relativa a que el derecho a pedir la reparación de agravios garantice un derecho a remedios particulares. Por el contrario, lo que ha señalado es que los tribunales son un foro en el que se ejercita el derecho. Nunca se ha declarado que éste sea una garantía de remedios. A los recurrentes no se les ha privado del acceso a los tribunales. Por lo tanto, su alegación relativa a que las clasificaciones de la Ley Núm. 104, *supra*, afectan su derecho a pedir al Gobierno la reparación de agravios es inmeritoria.

Por último, examinaremos si los recurrentes tienen a su favor un derecho fundamental a recibir compensación total por sus daños. Ni este Tribunal ni el Tribunal Supremo federal han hecho manifestación alguna en ese sentido. Aun en estados con disposiciones constitucionales que garantizan el derecho a remedios se ha sostenido que no existe un derecho fundamental a compensación total por

daños.([21]) *Estate of Cargill v. City of Rochester*, 406 A.2d 704, 706 (1979); *Dover v. Imperial Cas. and Idem. Co.*, 575 A.2d 1280, 1284 (1990); *Wright v. Colleton County School Dist.*, 391 S.E. 2d 564, 570 (1990). En Montana se interpretó que una disposición similar confería un derecho fundamental a compensación total por daños.([22]) *White v. State*, 661 P.2d 1272, 1275 (Mont. 1983); *Pfost v. State*, 713 P.2d 495, 502–503 (Mont. 1985). Sin embargo, posteriormente estos casos fueron revocados y se concluyó que la Constitución del estado no lo garantiza. *Meech v. Hill Haven West, Inc.*, 776 P.2d 488, 491 (Mont. 1989); Comentario, J.A. Kutzman, *The King Resurrection: Sovereign Immunity Returns to Montana*, 51 Mont. L. Rev. 529, 536–537 (1990).

█ Ni en el texto de nuestra Constitución, ni en el Diario de Sesiones, *supra*, ni en nuestra jurisprudencia existen declaraciones que justifiquen reconocer éste como un derecho fundamental. Por lo tanto, concluimos que bajo la Constitución del E.L.A. no existe un derecho fundamental a recibir compensación total por daños. Debido a que la Ley Núm. 104, *supra*, no afecta derecho fundamental alguno de los recurrentes es inmeritorio su reclamo de que utilicemos el escrutinio estricto.

Al analizar legislación similar a nuestra Ley Núm. 104, *supra*, gran número de jurisdicciones estatales han usado

---

([21]) "Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws." Pt. 1, Art. 14, Const. N. H., 1 *New Hampshire Revised Statutes Annotated*, New Hampshire, Ed. Equity, 1988, pág. 70.

"All courts shall be public, and every person shall have speedy remedy therein for wrongs sustained." Art. 1, Sec. 7, Const. S. C.

([22]) "Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen's Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay." Art. II, Sec. 16, Const. Mont., 1 *Revised Codes of Montana*, suppl, Indiana, Allen Smith Company, 1977.

el escrutinio de nexo racional porque la misma no afecta derechos fundamentales ni presenta clasificaciones sospechosas. Además, se aplica este escrutinio por ser considerada legislación de tipo socioeconómico. *Stanhope v. Brown Cty.*, 280 N.W.2d 711 (1979); *Jetton v. Jacksonville Elec. Authority*, 399 So.2d 396 (1981); *Cauley v. City of Jacksonville*, 403 So.2d 379 (1981); *Leliefeld v. Johnson*, 659 P.2d 111 (Idaho 1983); *Packard v. Joint School Dist. No. 171*, 661 P.2d 770 (Idaho App. 1983); *Lee v. Colorado Dept. of Health*, 718 P.2d 221 (Colo. 1986); *Lienhard v. State*, 417 N.W.2d 119 (1987), 431 N.W.2d 861 (1988); *Wilson v. Gipson*, 753 P.2d 1349 (Okl. 1988); *Hale v. Port of Portland*, 783 P.2d 506 (Or. 1989); *Wright v. Colleton County School Dist.*, 391 S.E.2d 564 (1990); *Texas Dept. of Mental Health v. Petty*, 817 S.W.2d 707 (1991); *State v. Defoor*, 824 P.2d 783 (Colo. 1992); *Murphy v. Edmonds*, 601 A.2d 102 (1992).

Sin embargo, existen algunas jurisdicciones que, al examinar los estatutos que imponen límites a las cuantías compensables por daños, han utilizado el escrutinio intermedio. *Carson v. Maurer*, 424 A.2d 825 (1980); *Dover v. Imperial Cas. & Idem. Co.*, 575 A.2d 1280 (1990); *Brannigan v. Usitalo*, 587 A.2d 1232 (1991); *Condemarin v. University Hosp.*, 775 P.2d 348 (Utah 1989); *Trujillo v. City of Albuquerque*, 798 P.2d 571 (1990). Éstas han reconocido que el derecho a recobrar la totalidad de los daños es de tal importancia que requiere el uso de este escrutinio. *Carson v. Maurer*, supra, pág. 830; *Dover v. Imperial Cas and Idem Co.*, supra, pág. 1284; *Brannigan v. Usital*, supra, pág. 1234; *Condemarin v. University Hosp.*, supra, pág. 360; *Trujillo v. City of Albuquerque*, supra, pág. 578.

Aunque reconocemos la importancia del interés de las personas en recibir una compensación razonable por los daños que sufran como consecuencia de acciones negligentes, consideramos que el escrutinio que debe aplicarse es el de nexo racional, por ser una legislación de naturaleza socioeconómica. Debemos determinar, pues, si existe

nexo racional entre la clasificación hecha por el legislador y el interés que el Estado procura adelantar. *Treatise on Constitutional Law*, supra, Vol. 2, pág. 60.

En el Informe de las Comisiones de lo Jurídico Civil y de Gobierno de la Cámara de Representantes sobre el P. de la C. 1033 de 17 de agosto de 1983, 9na Asamblea Legislativa, 7ma Sesión Extraordinaria, proyecto que luego se convirtió en la Ley Núm. 30 de 25 de septiembre de 1983, se expresó:

> Al no estar limitada la responsabilidad del Estado se ha establecido un considerable aumento en las cuantías reclamadas en las demandas contra el Estado, así como en la cuantía por concepto de las sentencias recaídas.
>
> . . . . . . . . .
>
> [L]a ausencia de unos parámetros para la concesión de daños contra el Estado ha sido de impacto significativo en los recursos del fisco. Informe, *supra*, págs. 3–4.

En el citado Informe se expone que la cuantía por concepto de sentencias recaídas durante 1981, cuando estaban vigentes los límites de quince mil dólares ($15,000) y treinta mil dólares ($30,000) fue de un millón setenta y un mil setecientos cuarenta y ocho dólares ($1,071,748). En 1982, sin límites aplicables, la cuantía aumentó a cinco millones setecientos quince mil quinientos dieciséis dólares ($5,715,516). Ante esta situación, la Legislatura decidió aprobar nuevos límites de setenta y cinco mil dólares ($75,000) y ciento cincuenta mil dólares ($150,000). De lo anterior se desprende que el interés que el Estado procura adelantar es la protección de los recursos económicos del E.L.A. Reconocemos que éste es un interés legítimo del Estado.

Los recurrentes sostienen que la ley creó una clasificación discriminatoria al distinguir entre las reclamaciones contra el Estado y las que son contra entes privados. En las primeras sólo se compensa hasta el límite dispuesto por ley, mientras que para las segundas no hay

límite. Consideramos que existe nexo racional entre el interés en proteger el fisco y la limitación a la cuantía compensable, pues esta clasificación responde a diferencias reales entre el Estado y un ente privado. A través del Estado los ciudadanos reciben servicios tales como la seguridad pública y los servicios médicos, entre otros. Para subvencionarlos cuenta con recursos de naturaleza limitada. Por el contrario, los entes privados no tienen estas responsabilidades. *Lienhard v. State*, supra; *Stanhope v. Brown Cty.*, supra, pág. 719; *Hale v. Port of Portland*, supra, pág. 516; *State v. Defoor*, supra, págs. 789–790. Precisamente debido a la amplia gama de servicios que ofrece el Estado se encuentra mucho más expuesto que una persona particular a responder en daños, mermando así los recursos con que cuenta para financiar los servicios que ofrece. *Lee v. Colorado Dept. of Health*, supra, págs. 227–228. Esta diferencia justifica la clasificación impugnada y demuestra que existe nexo racional entre el interés del Estado en la protección del fisco y la limitación a las cuantías compensables.

La segunda clasificación que impugnan los recurrentes es la que distingue entre aquellos perjudicados por actuaciones de funcionarios del gobierno cuyos daños exceden los límites dispuestos por ley y los que sus daños no exceden tales límites. Sólo los últimos obtendrán un resarcimiento total.

Como ya hemos señalado, el interés legítimo del Estado en esta legislación es la protección del fisco. La limitación impuesta a las cuantías compensables está razonablemente relacionada con el mismo. *Leliefeld v. Johnson*, supra, pág. 128; *Packard v. Joint School Dist. No. 171*, supra, pág. 775; *Wilson v. Gipson*, supra, pág. 1353.

En el área de reglamentación socioeconómica le hemos reconocido vasta discreción a la Asamblea Legislativa para establecer clasificaciones, siempre que éstas estén razonablemente relacionadas con el propósito de la

legislación. Además, éstas no se considerarán arbitrarias si puede concebirse una situación que las justifique. *Coca-Cola Bottling Co. v. Srio. de Hacienda*, 112 D.P.R. 707, 710 (1982). No se viola la cláusula de la igual protección de las leyes porque las clasificaciones sean imperfectas. "Para bregar con los problemas prácticos del gobierno a veces es necesario hacer clasificaciones aunque las líneas de demarcación sean algo crudas y esas determinaciones legislativas no se anularán si las situaciones fácticas lo justifican." *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972). Véase *M. & B.S., Inc. v. Depto. de Agricultura*, supra, pág. 333.

Según surge del Informe de las Comisiones, la Legislatura consideró evidencia relacionada con el impacto en el fisco de las sentencias contra el Estado. En cuanto a esto concluyó que "los límites propuestos guardan una relación realista con los cambios socioeconómicos de nuestro pueblo y la capacidad de éste para afrontar sus responsabilidades. Es por ello que entendemos que el impacto que genera la ampliación de dichos límites podrán [sic] ser provistos [sic] adecuadamente por el Estado". Informe, *supra*, pág. 8. Debido a que la decisión legislativa está fundamentada razonablemente a base de los hechos expuestos en el Informe, no podemos declarar la clasificación inconstitucional, aunque la misma sea imperfecta o sus "líneas de demarcación sean algo crudas". Por lo tanto, resolvemos que las clasificaciones dispuestas por la Ley Núm. 104, según enmendada, *supra*, no violentan la garantía de la igual protección de las leyes. Si por razón del transcurso del tiempo y el desarrollo de la economía debieran revisarse los límites dispuestos en 1983, ésta es una labor que le corresponde a la Asamblea Legislativa.

C. En tercer lugar, los recurrentes sostienen que el estatuto viola la garantía del debido proceso de ley en su vertiente sustantiva. Ellos alegan que los límites son arbitrarios.

La Legislatura, en el ejercicio de su poder de razón de estado, goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad. La única limitación que tiene es la dispuesta por la garantía del debido proceso de ley. *E.L.A. v. Márquez*, 93 D.P.R. 393, 402 (1966), *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (1983).

El debido proceso de ley en su vertiente sustantiva prohibe que la persona sea privada arbitrariamente de un interés de libertad o propiedad. Una ley no será declarada inconstitucional por violar esta disposición siempre que la misma tenga una relación real y sustancial con el interés estatal que persigue y que no sea irrazonable, arbitraria o caprichosa. *Nebbia v. New York*, 291 U.S. 502, 525 (1934); *A. Roig, Sucrs. v. Junta Azucarera*, 77 D.P.R. 342, 357 (1954). Los tribunales al examinar una controversia relativa a esta garantía constitucional "no entrarán en consideraciones sobre la sabiduría de las medidas legislativas, sino que sostendrán su constitucionalidad a menos que no tengan un propósito público legítimo, o sean claramente arbitrarias, o que no guarden una relación razonable con el propósito público que persiguen". *Morales v. Lizarribar*, 100 D.P.R. 717, 731 (1972). Véase *Nebbia v. New York*, supra, págs. 537–538. El análisis de debido proceso de ley sustantivo es esencialmente similar al de la igual protección de las leyes mediante el escrutinio de nexo racional. *Marina Ind., Inc. v. Brown Boveri Corp.*, supra, pág. 81.

El derecho a instar una demanda en daños y perjuicios constituye un interés propietario de los recurrentes. *Vda. de Delgado v. Boston Ins. Co.*, 101 D.P.R. 598, 605 (1973); *Consejo de Titulares v. C.R.U.V.*, 132 D.P.R. 707 (1993). Como expusimos anteriormente, el interés del Estado en la protección del fisco es uno legítimo que está razonablemente relacionado con la limitación económica dispuesta por la ley. Por lo tanto, lo único que tenemos que

determinar es si los límites son claramente arbitrarios, de manera que violenten el debido proceso de ley.

La selección de los límites de setenta y cinco mil dólares ($75,000) y ciento cincuenta mil dólares ($150,000) está fundamentada en evidencia relativa al impacto económico que tienen en el fisco las reclamaciones contra el E.L.A. Por lo tanto, los límites tienen un fundamento racional y no son claramente arbitrarios. Además, el Tribunal Supremo federal ha declarado que los límites a cuantías compensables siempre tienen un elemento de arbitrariedad, pero que el mismo no es de tal magnitud que acarree la inconstitucionalidad de la ley.

> [W]hatever ceiling figure is selected will, of necessity, be arbitrary in the sense that any choice of a figure based on imponderables like those in issue here can be always be so characterized. This is not, however, the kind of arbitrariness which flaws otherwise constitutional action. *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 86 (1978).

▬ A la luz de estas determinaciones resolvemos que los Arts. 2 y 7 de la Ley Núm. 104, *supra*, según enmendada, no violan la garantía del debido proceso de ley sustantivo. Estos no adolecen de vicio constitucional alguno. Por lo tanto, sostenemos su constitucionalidad.

## V

*Límite de responsabilidad del Estado por reclamante o causa de acción en casos de prorrateo*

El Procurador General en su recurso RE–88–199, plantea que el tribunal de instancia erró al concederle al demandante Ed Defendini Acosta la suma de doscientos veintitrés mil doscientos cuarenta y nueve dólares ($223,249) por sus daños. Además, sostiene que por disposición del Art. 2 de la Ley Núm. 104, *supra*, a Defendini Acosta sólo se le podían conceder setenta y cinco mil dólares ($75,000), "pues dicho demandante sólo contaba con una causa de

acción".([23]) El tribunal de instancia calculó los daños causados a Defendini y a sus padres en doscientos cincuenta y cuatro mil doscientos cuarenta y nueve dólares ($254,249) y ordenó al E.L.A. el pago de esta suma.

■ Consistentemente hemos reiterado en nuestras opiniones que

> es principio cardinal de hermenéutica que "[a]l interpretar una disposición específica de una ley, los tribunales deben siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y nuestra determinación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener". ... Nuestra obligación fundamental en estos casos es imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la ley. ... Al interpretar y aplicar un estatuto hay que hacerlo teniendo presente el propósito social que lo inspiró. (Citas omitidas.) *Vázquez v. A.R.Pe.*, 128 D.P.R. 513, 523 (1991).

Procede, pues, que examinemos el historial legislativo de la Ley Núm. 111, *supra,* porque ésta introdujo el concepto de un límite mayor, en esa ocasión de treinta mil dólares($30,000), para cuando se causa daño a más de una persona o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado.

La Ley Núm. 111, *supra,* se aprobó en reacción a dos (2) decisiones nuestras; *Vda. de Valentín v. E.L.A.,* 84 D.P.R. 112 (1961), y *Ramos Rivera v. E.L.A.,* 90 D.P.R. 817 (1964). Dichas opiniones aclararon que el límite prevaleciente en aquel momento, quince mil dólares ($15,000), se refería a los daños sufridos por cada demandante o por cada causa

---

([23]) En su parte pertinente, el Art. 2 de la Ley Núm. 104, *supra,* 32 L.P.R.A. sec. 3077, dispone:

"*Cuando por tal acción u omisión se causaren daños y perjuicios a más de una persona,* o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, *la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder la suma de ciento cincuenta mil ($150,000) dólares.* Si de las conclusiones del tribunal surgiera que la suma de los daños causados a cada una de las personas excede de ciento cincuenta mil (150,000) dólares, el tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno." (Énfasis suplido.)

de acción que tuviera un solo perjudicado. *Vda. de Valentín v. E.L.A.*, supra, pág. 122.

El mismo principio lógico que nos indujo a resolver en el caso de *Vda. de Valentín v. E.L.A.*, supra, que el tope de responsabilidad de $15,000 fijado por la Ley Núm. 104 se refiere a los daños sufridos por cada demandante, resulta válido para resolver que cuando son varias las causas de pedir que tenga un solo perjudicado, cada una de ellas, por ser una reclamación distinta de la otra, debe ser compensada hasta la suma de $15,000, aunque por la exigencia procesal de la jurisdicción deban unirse todas en una misma demanda, a menos que no hayan circunstancias de tiempo y espacio, dentro del derecho de prescripción, que exijan lo contrario. *Ramos Rivera v. E.L.A.*, supra, pág. 820.

Para evitar que el Estado estuviera expuesto a responsabilidad ilimitada en casos de varios demandantes o de un solo demandante con varias causas de acción, se presentó en la Asamblea Legislativa el P. del S. 27 que luego se convirtió en la Ley Núm. 111, *supra.* Según surge claramente de los Informes de las Comisiones de lo Jurídico Civil del Senado y de lo Judicial de la Cámara de Representantes, el propósito de esta legislación fue limitar el efecto de las decisiones citadas.

En diciembre de 1961, nuestro Tribunal Supremo interpretó en forma liberal la mencionada Ley núm. 104 de 1955 resolviendo que el tope de responsabilidad de quince mil (15,000) dólares se refiere a los daños que hubiese sufrido cada demandante y no a la totalidad de todos los daños que hubiesen sido sufridos por todos los demandantes en un mismo accidente.

Esta interpretación liberal de la ley por el Tribunal Supremo ha sido reiterada en fecha reciente.

*Por consiguiente, vista la dimensión tan amplia que se le ha dado a la responsabilidad civil del Estado en virtud de los recientes pronunciamientos del Tribunal Supremo, existe el riesgo de que, como consecuencia de un accidente en que resulten perjudicados un número considerable de personas, podría imponerse al Estado Libre Asociado, a la luz de la responsabilidad que impone la repetida Ley Núm. 104, una carga económica de tal índole que pueda afectar apreciablemente los fondos disponibles para la estructuración de las funciones normales de gobierno.*

*Para atemperar el alcance de las decisiones judiciales mencionadas es que se propone la enmienda en cuestión.* El proyecto dispone, además, que si de las conclusiones del Tribunal, surgiera que la suma de los daños causados a cada uno de los reclamantes excede treinta mil (30,000) dólares, se procederá a distribuir tal cantidad entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno de ellos. (Énfasis suplido.) Informe de la Comisión de lo Jurídico Civil del Senado sobre el P. del S. 27, 19 Diario de Sesiones de la Asamblea Legislativa (Senado), Parte 3, pág. 1185 (1965).

La necesidad de esta medida surge de interpretaciones hechas por nuestro Honorable Tribunal Supremo a la Ley núm. 104 de 1955, según enmendada en el sentido de que cada demandante tiene derecho a obtener, sin autorización de la Asamblea Legislativa, un tope de 15,000, lo cual coloca el poder para demandar al Estado sin su autorización en un riesgo ilimitado. *El fin del proyecto es el de atemperar la interpretación judicial fijándole un límite bajo las circunstancias expresadas.* (Énfasis suplido.) Informe de la Comisión de lo Judicial de la Cámara de Representantes sobre el P. del S. 27, 19 Diario de Sesiones de la Asamblea Legislativa (Cámara), Parte 5, pág. 1964 (1965).

Del historial legislativo surge con meridiana claridad que la intención legislativa fue evitar que el Estado tuviera que responder sin límite en casos de reclamaciones o demandantes múltiples debido a nuestras expresiones en *Vda. de Valentín v. E.L.A.*, supra, y en *Ramos Rivera v. E.L.A.*, supra. A esos efectos se impuso el límite de treinta mil dólares ($30,000) para estas situaciones y se dispuso para el prorrateo del mismo en caso de que la cuantía adjudicada a los demandantes excediera esta suma. No existe expresión alguna en los Informes de las Comisiones, ni en el texto de la ley, que nos permita inferir que la Asamblea Legislativa quizo que en casos de prorrateo un reclamante con una sola causa de acción pudiera obtener compensación en exceso del límite de quince mil dólares ($15,000). El propósito de la Ley Núm. 111, *supra,* no fue revocar nuestras decisiones con relación a que el límite por demandante o causa de acción era quince mil dólares ($15,000). Su propósito fue atemperar el alcance de nuestra determinación a fin de proteger el fisco.

■ Un análisis integral del Art. 2 de la Ley Núm. 104, *supra*, nos lleva a concluir que la Legislatura en ningún momento pretendió eliminar el límite de quince mil dólares ($15,000) por reclamante para casos de reclamantes múltiples con una sola causa de acción. Lo que hizo la ley fue poner un límite a la cuantía total por la cual puede ser responsable el Estado en estos casos. El límite de quince mil dólares ($15,000) por reclamante o causa de acción quedó inalterado.

La enmienda de 1983 impuso el límite de ciento cincuenta mil dólares ($150,000) cuando la acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier persona actuando en capacidad oficial o dentro del marco de su función, cargo o empleo, interviniendo culpa o negligencia, causara daños a más de una persona o diera lugar a más de una causa de acción. Este es el límite que aplica a la demanda instada por Ed Defendini y sus padres, por ser éste un caso en el que se causaron daños a más de una persona.

El Procurador General impugna la cuantía adjudicada a Ed Defendini. Este sostiene que la misma no debió exceder de setenta y cinco mil dólares ($75,000) porque Defendini sólo cuenta con una causa de acción a su favor. Para poder determinar si Defendini tiene una o varias causas de acción debemos examinar primero el alcance o ámbito del concepto "causa de acción" *para propósitos de la Ley de Reclamaciones y Demandas contra el Estado*, Ley Núm 104, *supra*.

La búsqueda de una definición para el término "causa de acción" fue una tarea a la que se dedicaron varios tratadistas norteamericanos de finales del siglo diecinueve y principios del presente siglo. Sin embargo, no lograron ponerse de acuerdo. Algunos definen "causa de acción" en términos de un derecho a favor del demandante y un deber del demandado. La causa de acción surge cuando el de-

mandado, en violación de su deber, menoscaba el derecho del demandante.

> Every judicial action must therefore involve the following elements: a primary right possessed by the plaintiff, and a corresponding primary duty devolving upon the defendant; a delict or wrong done by the defendant which consisted in a breach of such primary right and duty; a remedial right in favor of the plaintiff, and a remedial duty resting on the defendant springing from this delict, and finally the remedy or relief itself. ... *Of these elements, the primary right and duty and the delict or wrong combined constitute the cause of action in the legal sense of the term,* and as it is used in the codes of the several States. (Énfasis suplido.) J.N. Pomeroy, *Code Remedies: Remedies and Remedial Rights by the Civil Action,* 4ta ed., Boston, Ed. Little, Brown and Co., 1904, págs. 460–461. Véanse, además: W.A. Sutherland, *A Treatise on Code Pleading and Practice,* San Francisco, Ed. Bancroft–Whitney Co., 1910, Vol. I, pág. 120; M.M. Estee, *Estee's Pleadings, Practice and Forms: Adapted to Actions and Special Proceedings under Codes of Civil Procedure,* 4ta ed., San Francisco, Ed. Bancroft-Whitney Co., 1898, Vol. I, pág. 92.

Otros definen el concepto como un grupo de hechos que justifican la concesión de un remedio. C.E. Clark, *The Code Cause of Action,* 33 Yale L.J. 817,828 (1924); *Code Practice and Remedies in Courts of Record in Civil Cases in the Western States,* San Francisco, Ed. Bancroft–Whitney Co., 1927, Vol. I, págs. 148–149.

Los tribunales tampoco han esbozado una definición general para este término. Pomeroy, *supra,* pág. 460. Por el contrario, lo que prevalece es la multiplicidad y variedad de definiciones. *Code Practice and Remedies in Courts of Record in Civil Cases in the Western States,* supra, págs. 148–153.

> A cause of action has been variously defined as follows: what a plaintiff must prove to obtain a judgment; the wrong of which a plaintiff complains and for which he or she asks relief; the legal liability arising out of the facts on which plaintiff relies; a matter for which an action may be brought; a right which the law will enforce to recover something from another; the concurrence of the facts which give rise to an enforceable claim; the

unlawful violation of a right which the facts show; and the subject matter of the controversy. 4 *Thompson's Cyclopedia of Federal Procedure* Sec. 14.158, págs. 277–278 (3ra ed. 1992). Véanse, además: *Black's Law Dictionary*, 5ta ed., Minnesota, Ed. West Publishing Co., 1979, pág. 201. Los tratadistas están contestes en que éste es un concepto ambiguo que elude una definición precisa. T.W. Arnold, *The Code "Cause of Action" Clarified by United States Supreme Court*, 19 A.B.A. J. 215 (1933); C.C. Wheaton, *The Code "Cause of Action": Its Definition*, 22 Cornell L.Q. 1, 11 (1936); A. Reppy, *Introduction to Civil Procedure: Actions and Pleading at Common Law*, Buffalo, Ed. Dennis and Co., 1954, pág. 91 esc. 45.

El Tribunal Supremo federal ha señalado que el término "causa de acción" carece de un significado único, por lo que es inútil tratar de adjudicarle una definición general. La definición dependerá del contexto en el que se invoque.

A "cause of action" may mean one thing for one purpose and something different for another. It may mean one thing when the question is whether it is good upon demurrer, and something different when there is a question of the amendment of a pleading or of the application of the principle of *res judicata*. (Citas omitidas.) At times and in certain contexts, it is identified with the infringement of a right or the violation of a duty. At other times and in other contexts, it is a concept of the law of remedies, the identity of the cause being then dependent on that of the form of action or the writ. Another aspect reveals it as something separate from writs and remedies, the group of operative facts out of which a grievance has developed. This court has not committed itself to the view that the phrase is susceptible of any single definition that will be independent of the context or of the relation to be governed. *U.S. v. Memphis Cotton Oil Co.*, 288 U.S. 62, 67–68 (1933). Véanse, además: *Hurn v. Oursler*, 289 U.S. 238 (1932); *Gully v. First Nat. Bank*, 299 U.S. 109 (1936); *United States v. Dickinson*, 331 U.S. 745 (1947); *American Fire & Cas. Co. v. Finn*, 341 U.S. 6 (1951); *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).

Un estudio de nuestra jurisprudencia demuestra que hemos adoptado el examen contextual del término "causa de acción". Así encontramos una definición para efecto de la acumulación de acciones (*Ortiz v. Texidor, Juez de Distrito*, 27 D.P.R. 134, 139–140 (1919)) y otra distinta

en el contexto de la doctrina de *res judicata (Mercado Riera v. Mercado Riera*, 100 D.P.R. 940, 951–952 (1972); *Lausell Marxuach v. Díaz Yáñez*, 103 D.P.R. 533, 536 (1975)).

 El término "causa de acción" se utiliza en el Art. 2 de la Ley Núm. 104, *supra*, en el contexto de la responsabilidad civil extracontractual por acciones u omisiones negligentes. La causa de acción en daños y perjuicios fundamentada en conducta negligente consta de tres (3) elementos:

1. El acto o conducta negligente. Para que éste ocurra tiene que:
 a. existir un deber reconocido por ley "de ejercer aquel grado de cuidado, cautela, circunspección, diligencia, vigilancia y precaución que sea necesario para no exponer a riesgos irrazonables de daños, como consecuencia de la conducta del actor, a aquellas personas que, por no estar muy remotas de éste, un hombre prudente y razonable hubiese previsto, dentro de las circunstancias del caso, que quedaban expuestas al riesgo creado por el autor" (H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, Cap. VII, págs. 180–181); y
 b. "que el actor quebrante dicho deber." Brau del Toro, *op. cit.*
2. Que produzca daños.
3. Que exista relación causal suficiente en derecho entre el acto negligente y los daños producidos. Véanse, además: M. Albaladejo, *Derecho Civil*, 8va ed., Barcelona, Ed. Bosh, 1989, T. II, Vol. 1, págs. 519–521; J. Santos Briz, *Derecho de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, pág. 22; *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 105 (1986); *Bonilla v. Chardón*, 118 D.P.R. 599, 610 (1987); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Arroyo López v. E.L.A.*, 126 D.P.R. 682 (1990); *Torres Maldonado v. J.C. Penney Co.*, 130 D.P.R. 546 (1992); *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993).

 Los daños, producto del acto negligente y por los que se reclama compensación, son sólo un elemento de la causa de acción. Brau del Toro, *op. cit.*, Cap. VIII, pág. 423. Por lo tanto, constituye un error identificar los remedios reclamados con la causa de acción. Pomeroy, *op. cit.*, págs.

460, 462–463; *Code Practice and Remedies in Courts of Record in Civil Cases in the Western States*, supra, pág. 153.

En *Ramos Rivera v. E.L.A.*, supra, le reconocimos al demandante Rafael Ramos Rivera tres (3) causas de acción que surgieron de un accidente de tránsito. La primera por los daños físicos y mentales sufridos por él, la segunda por la muerte de su esposa y la tercera por la muerte de su hijo. Allí expresamos que a veces un evento puede generar varias causas de acción a favor de un demandante.

> *Es indudable que en un accidente se pueden dar diversas relaciones entre las personas perjudicadas y distintas circunstancias de tiempo y espacio que indiquen la separabilidad de cada causa de acción.* La jurisprudencia se va inclinando cada vez más a considerar la relación de cada persona con el accidente o hecho culposo como una distinta causa de acción que debe ser compensada independientemente, la una de la otra, en una sola demanda o en demandas separadas, de acuerdo con la exigencia de las reglas de procedimiento aplicables a cada jurisdicción, *y así se consideran como causas de acción separadas la una de la otra, aunque se produzcan dentro de un mismo accidente, la de una persona por sus propios daños físicos y por los daños a otra persona por la cual tenga él derecho a reclamar por nexo familiar, dependencia, subrogación,* etc. (Énfasis suplido.) *Ramos Rivera v. E.L.A.*, supra, págs. 819–820.

Hemos reconocido como una causa de acción independiente de la propia la heredada de la víctima de una acción u omisión culposa o negligente por los daños sufridos por ésta hasta el momento de su deceso. Esto es lo que en *Ramos Rivera v. E.L.A.*, supra, identificamos como una *causa de acción por subrogación. Tropigas de P.R. v. Tribunal Superior*, 102 D.P.R. 630, 638 (1974). Por otra parte, los dependientes de la víctima de un acto negligente tienen a su favor una causa de acción "por su condición de recipientes de unos ingresos que se ven interrumpidos total o parcial, temporero[s] o permanente[mente]". *Zurkowsky v. Honeywell, Inc.*, 112 D.P.R. 271, 275 (1982). Esta es la que llamamos *causa de acción por dependencia. Pate v. U.S.A.*, 120 D.P.R. 566, 571 (1988). A través de ésta se

compensa al demandante por los daños patrimoniales que le ocasionó la interrupción en sus ingresos. También se reconoce una causa de acción por los daños morales que sufren las personas vinculadas por lazos de parentesco, afecto y cariño con la víctima de la actuación negligente. *Caéz v. U.S. Casualty Co.*, 80 D.P.R. 754, 761 (1958). A ésta la denominamos *causa de acción por nexo familiar*. La misma va dirigida a resarcir al demandante por los daños morales que sufrió.

Es importante notar que en estas tres (3) causas de acción el acto negligente se infligió contra una persona *distinta* del demandante. Esto es lo que las distingue de la causa de acción que tiene el demandante por los daños personales y patrimoniales,([24]) sean estos generales o especiales, que él haya sufrido como consecuencia de un acto negligente que se comete contra su persona.

A Ed Defendini se le concedió compensación por sus daños físicos y mentales, y por disminución de su capacidad productiva. Estos son los daños personales y patrimoniales que él sufrió. La compensación por disminución de la capacidad productiva de Ed Defendini no constituye una causa de acción independiente por razón de dependencia. Por lo tanto, éste sólo tiene a su favor una causa de acción.

Procede ahora que determinemos cómo se realizará el prorrateo del límite de ciento cincuenta mil dólares ($150,000) que dispone la ley. Al hacerlo debemos tener en cuenta que la norma básica es que el Estado responde hasta setenta y cinco mil dólares ($75,000) por daños a la persona o a la propiedad. Al analizar ambas partes de la sección conjuntamente, concluimos que a los casos de demandantes múltiples o de un solo demandante con varias

---

([24]) El tratadista Herminio Brau del Toro clasifica los daños y perjuicios en personales y patrimoniales. "Así pues, los daños y perjuicios pueden ser personales y patrimoniales, pudiendo desdoblarse los personales en corporales y morales según afecten al cuerpo o al espíritu." H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, Cap. VIII, pág. 427.

causas de acción también le aplica el límite de setenta y cinco mil dólares ($75,000). Por lo tanto, en casos de prorrateo, el máximo que se puede compensar por reclamante con una sola causa de acción será de setenta y cinco mil dólares ($75,000) y a aquellos con más de una causa de acción será de setenta y cinco mil dólares ($75,000) por cada causa de acción, siempre y cuando la totalidad de lo concedido no sobrepase la suma límite de cientocincuenta mil dólares ($150,000).

## VI

*Conclusión*

Por todo lo antes expuesto, procede que en los casos de *Defendini Collazo v. E.L.A.*, RE-88-196 y RE-88-199, *se dicte sentencia modificando la emitida por el Tribunal Superior, Sala de Caguas, el 15 de diciembre de 1987, limitando la responsabilidad del Estado a setenta y cinco mil dólares ($75,000) por concepto de daños físicos y mentales, y por disminución de la capacidad productiva del demandante Ed Defendini; dieciocho mil dólares ($18,000) por las angustias mentales del codemandante Egmidio Defendini; cinco mil trescientos cincuenta dólares ($5,350) por gastos incurridos y gastos futuros relacionados con el cuido de su hijo, y trece mil dólares ($13,000) por las angustias mentales de la codemandante Rufina Acosta, y así modificada se confirma la misma.*

Con relación al caso *M.F.R. v. Álamo García*,[25] RE-90-371, *procede que se dicte sentencia confirmando la emitida por el Tribunal Superior, Sala de Humacao, el 6 de abril de 1990.*

El Juez Asociado Señor Rebollo López concurrió con una opinión escrita. El Juez Asociado Señor Fuster Berlingeri

---

[25] En este caso ni el Estado ni los demandantes cuestionaron el prorrateo de las cuantías.

emitió voto separado de conformidad. El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Alonso Alonso disintió con una opinión escrita.

– O –

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Independientemente de la corrección o no de la aseveración que se hace en la Opinión disidente del compañero Juez Señor Alonso Alonso, a los efectos de que la "doctrina de la inmunidad del Estado es un anacronismo jurídico que tiene mejor cabida en un museo de arqueología jurídica que en nuestro Derecho puertorriqueño", *lo cierto es que en el presente caso a lo que nos enfrentamos es a la impugnación de la validez constitucional de un estatuto aprobado por la Asamblea Legislativa de Puerto Rico*; situación para la cual, como es de general conocimiento, este Tribunal —siguiendo jurisprudencia federal— *ha establecido jurisprudencialmente unos "criterios" (tests) a la luz de los cuales se determina en nuestra jurisdicción la validez constitucional de los estatutos impugnados.*

De manera, pues, que de nada vale que nos enfrasquemos en una pugna para determinar si la doctrina de inmunidad del Estado tiene o no, como sostiene el Juez Señor Alonso Alonso en su opinión disidente, pág. 93, "su origen en concepciones arcaicas provenientes del derecho común que, nunca debieron haber sido incorporados en nuestro ordenamiento por ser contrarias a la doctrina histórica del derecho civil ...". *El hecho histórico y real es que la referida doctrina sí fue incorporada a nuestro ordenamiento*; ello mediante la aprobación por la Asamblea Legislativa de Puerto Rico de la Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. sec. 3077 *et seq.*

*La controversia a resolver por este Tribunal, en consecuencia, es si dicha legislación constituye, o no, un ejercicio*

*válido del poder que le confiere nuestra Constitución a la Asamblea Legislativa de Puerto Rico.*

## I

El planteamiento constitucional de los demandantes que, a nuestro juicio, merece consideración es el relacionado con la alegada violación de la cláusula constitucional sobre igual protección de las leyes. Art. II, Sec. 7., Const. E.L.A., L.P.R.A ., Tomo 1. Como surge de la Opinión mayoritaria, los demandantes alegan que el estatuto en controversia *viola la citada disposición constitucional de dos (2) formas distintas*; esto es, que establece *dos (2) clasificaciones* constitucionalmente impermisibles. La *primera* de ellas, entre las personas que demandan al Estado y las personas que demandan a una persona o ente privado. En *segundo término*, y conforme los demandantes, se distingue impermisiblemente entre las personas perjudicadas que demandan al Estado que sufren daños *en exceso* de los límites impuestos por la citada Ley Núm. 104 y los que sufren daños *menores* a dichos límites ya que éstos últimos son indemnizados por todos los daños sufridos mientras que los primeros son indemnizados parcialmente.

## II

Como es de todos conocido, la citada cláusula constitucional sobre igual protección de las leyes *no* requiere, o exige, un trato igual para todos los ciudadanos. Lo que *sí* prohibe la referida disposición constitucional es un trato desigual injustificado. *Ramos Acevedo v. Tribunal Superior*, 133 D.P.R. 599 (1993); *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). Al enfrentarnos a legislación que establece clasificaciones, consistentemente hemos utilizado uno (1) de dos (2) criterios o escru-

tinios establecidos jurisprudencialmente en otras jurisdicciones, a saber: el escrutinio "estricto" o el "tradicional mínimo o de nexo racional". *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 537 (1984); *León Rosario v. Torres*, 109 D.P.R. 804 (1980).

Hemos aplicado, al enfrentarnos y analizar clasificaciones relativas a cuestiones de tipo social o económico, el escrutinio tradicional mínimo. Al amparo del mismo, la ley impugnada goza de una presunción de constitucionalidad y las clasificaciones establecidas legislativamente no serán invalidadas a menos que sean claramente arbitrarias. En otras palabras, demostrada la existencia de un nexo racional entre la clasificación impugnada y el interés legítimo perseguido por el Estado, la impugnación realizada deberá ser desestimada. *León Rosario v. Torres*, ante; *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972).

Cuando la clasificación legislativa afecta *derechos fundamentales* del ciudadano o establece clasificaciones *inherentemente sospechosas* deberá aplicarse el escrutinio estricto. *Wackenhut Corp. v. Rodríguez Aponte*, ante; *Com. Asuntos de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980). Este análisis es en extremo riguroso; bajo el mismo, la ley impugnada se presumirá inconstitucional y únicamente será sostenida si: (1.) el Estado demuestra un interés apremiante; (2.) la clasificación es necesaria para lograr el propósito deseado; (3.) no existe un medio menos oneroso para alcanzar el propósito perseguido; y (4.) existe una estrecha relación entre la ley o práctica y el propósito que se persigue. *Zachry International v. Tribunal Superior*, ante; *Brown v. Board of Education*, 347 U.S. 483 (1954).

En relación con el escrutinio estricto, y en lo pertinente al caso ante nuestra consideración, debe mantenerse presente que un derecho fundamental es aquel que está reconocido expresa o implícitamente en la Constitución. *San Antonio School District v. Rodríguez*, 411 U.S. 1 (1973);

*Seín v. Torres*, 109 D.P.R. 804 (1980). La Constitución del Estado Libre Asociado reconoce como derechos fundamentales: la igualdad ante la ley, el derecho al voto, la libertad de culto, la libertad de expresión, el derecho a la vida, el derecho a protección de ley contra ataques abusivos a la honra, el derecho a la intimidad y el derecho al disfrute de la propiedad. *González v. Ramírez Cuerda*, 88 D.P.R. 125 (1963); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971); *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734 (1975); *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984). Jurisprudencialmente se ha adicionado, entre otros, el derecho a procrear, a viajar entre estados y a tener asistencia de abogado ante una acusación criminal. *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Skinner v. Oklahoma*, 316 U.S. 535 (1942); *Gideon v. Wainright*, 372 U.S. 335 (1963).

Como doctrina general que gobierna esta situación, expone el Prof. Laurence H. Tribe: "Las clasificaciones legislativas deben someterse a escrutinio estricto y su inconstitucionalidad decretarse en ausencia de una justificación gubernamental apremiante si las mismas distribuyen los beneficios, o cargas, de una manera inconsistente con los derechos fundamentales." (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 1ra ed., Nueva York, Ed. Foundation Press, 1978, Sec. 16–7, pág. 1002.

La Opinión mayoritaria sostiene que nos enfrentamos a una legislación "de naturaleza socioeconómica", razón por la cual es de aplicación el escrutinio tradicional mínimo o de nexo racional. Por su parte, el compañero Juez Señor Alonso Alonso sostiene, en la Opinión disidente que emitiera, que estamos obligados a utilizar el escrutinio estricto por razón de que la legislación en controversia afecta derechos fundamentales.

## III

La legislación en controversia, no hay duda, tiene visos de ser una de tipo socioeconómico. De ello efectivamente ser así, resulta meridianamente claro que procede sostener la validez constitucional de la misma. Ello así por cuanto existe, sin lugar a dudas, un nexo racional entre la clasificación establecida y el interés legítimo que el Estado procura adelantar con el establecimiento de la misma, cual es, la protección de los recursos económicos del Estado Libre Asociado de Puerto Rico; recursos económicos que el Estado utiliza en beneficio de *todos* los ciudadanos de este País.

Es de notar, sin embargo, que la jurisprudencia que estableció esta norma, tanto al amparo de la Constitución federal como de la nuestra, surgió principalmente *en el contexto de la reglamentación estatal de la actividad comercial y la interferencia del Estado con la libertad de contratación.* Véanse: *Railway Express v. New York,* 336 U.S. 106 (1949); *Vélez v. Srio. de Justicia,* ante.(¹) *Tenemos serias dudas sobre si esta norma debe ser extendida a situaciones como la de autos, las cuales envuelven derechos de propiedad que no están propiamente ligados a la actividad comercial o a la libertad de contratación*; en otras palabras, *podría* ser factible que la legislación aquí impugnada afecte derechos fundamentales.

Dicha interrogante, sin embargo, *no* necesita ser contestada. Dados los hechos particulares del recurso ante nuestra consideración, la misma resulta ser innecesaria e inmaterial. Ello en vista del hecho de que la validez de la legislación en controversia *igualmente puede ser sostenida bajo el escrutinio estricto ya que la misma cumple con todos*

---

(¹) En *Nebbia v. New York,* 291 U.S. 502 (1934), y luego en *West Coast Hotel Co. v. Parrish,* 300 U.S. 379 (1937), el Tribunal Supremo federal abandonó la vieja doctrina de *Lochner v. New York,* 198 U.S. 45 (1905), para establecer que el Estado podía imponer cualquier reglamentación que fuera razonable para alcanzar los propósitos legítimos de política pública.

*y cada uno de los requisitos de dicho escrutinio*; esto es: el interés del Estado en proteger sus arcas, con el propósito de poder brindarles a todos los ciudadanos los servicios esenciales que tradicionalmente les facilita a los mismos, cualifica como un "interés apremiante"; la clasificación establecida resulta ser necesaria para lograr el propósito deseado; no existe un medio menos oneroso para lograr el propósito perseguido;[2] y, por último, definitivamente existe una relación estrecha entre la ley en controversia y el propósito que se persigue. Véase *Zachry International v. Tribunal Superior*, ante.

En resumen, somos del criterio que la controversia sobre si la citada Ley Núm. 104 de 1955 es una legislación de tipo socioeconómico o una que afecta derechos fundamentales es una estéril que no tiene que ser objeto de determinación por parte de este Tribunal. La misma, repetimos, dado los hechos particulares del caso, es una que resulta innecesaria resolver. Bajo uno u otro de los dos (2) criterios que han sido establecidos en esta jurisdicción para determinar la validez de un estatuto, la conclusión es la misma: *la Ley Núm. 104 de 29 de junio de 1955, según enmendada*, ante, *es constitucional.*

---

[2] Se nos ocurre, como alternativa al establecimiento de unos límites numéricos, que la Asamblea Legislativa podría establecer que las personas afectadas por la negligencia del Estado y sus agentes tengan derecho a recibir *un por ciento fijo* de la suma de dinero en que cuantifiquen los tribunales los daños sufridos por ellos. Esta alternativa tendría la ventaja de que todos los perjudicados serían tratados en "forma igual".

Dicha alternativa, sin embargo, *no* elimina la posibilidad de que el Estado se vea en la obligación de tener que pagar, una y otra vez, cuantiosas sumas de dinero en casos de daños y perjuicios; *razón por la cual la misma no ayuda a lograr el propósito que persigue la citada Ley Núm. 104 de 1955, cual es la de proteger los fondos públicos que son indispensables para proveer los servicios esenciales que necesita la ciudadanía.*

## – O –

Opinión disidente del Juez Asociado Señor Alonso Alonso.

### I

Al considerar la constitucionalidad de la doctrina de la inmunidad del Estado en la sociedad contemporánea, tenemos como marco de referencia que nuestra Constitución, en adición a organizar el Gobierno, va encaminada a proteger a la ciudadanía frente a los poderes del Estado y no viceversa. Además, el pueblo es la fuente del poder público y el poder político está subordinado a los derechos de los ciudadanos.

Nuestra Constitución es un documento dinámico que "no establece, ni debe establecer normas para la hora que pasa, sino principios para un futuro que se expande". B. Cardozo, *La naturaleza de la función judicial*, Buenos Aires, Ed. Asayú, 1955, pág. 64.

Este Tribunal, al sopesar los derechos constitucionales del pueblo frente al Estado, ha asumido posiciones de vanguardia valientes y sabias para imprimirle a éste el dinamismo necesario para atender no sólo las circunstancias del momento, sino las del futuro (*Noriega v. Gobernador*, 122 D.P.R. 650 (1988), y *Noriega v. Gobernador*, 130 D.P.R. 919 (1992)), y para que nuestra Constitución no se convierta en una pieza de museo o como los rollos del Mar Muerto. *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 350 (1983).

Como expresara, atinadamente, el distinguido Profesor Raúl Serrano Geyls:

Es procedente, por lo tanto, reconocer que una constitución debe interpretar la situación vital de un pueblo en su sentido esencialmente dinámico, captando la trayectoria de su evolución sin limitarse al reflejo estático de su situación en un momento dado. (Énfasis suprimido.) R. Serrano Geyls, *Derecho*

*Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 5.

La doctrina de la inmunidad del Estado es un anacronismo jurídico, la cual tiene mejor cabida en un museo de arqueología jurídica que en nuestro Derecho puertorriqueño. Dicha doctrina es intrínsecamente injusta, moralmente insostenible y carece de un fundamento racional. Tiene su origen en concepciones arcaicas provenientes del derecho común, que nunca debieron haber sido incorporadas en nuestro ordenamiento por ser contrarias a la doctrina histórica del derecho civil, y viola el principio más elemental de nuestra Constitución, en cuanto a que la soberanía radica en el pueblo y el Estado no está por encima de éste. Art. I, Secs. 1 y 2, Const. E.L.A., L.P.R.A., Tomo 1. Además, viola los derechos fundamentales de los ciudadanos en contravención de la igual protección de las leyes y el debido proceso de ley, pues no tiene justificación alguna en la sociedad contemporánea, ni responde a ningún interés apremiante del Estado.

De entrada, debo señalar que la doctrina de inmunidad del Estado afecta los *derechos fundamentales* de pedir al Gobierno la reparación de: (1) agravios (Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1); (2) el disfrute de la propiedad (Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1), y (3) que no se tomará o perjudicará la propiedad privada para uso público sin una *justa compensación* (Art. II, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1).

Por afectar los derechos constitucionales fundamentales, la legislación en controversia debe ser objeto de un escrutinio estricto y corresponde al Estado demostrar que existe un interés público apremiante para sostener su constitucionalidad, cosa que no ha hecho. Véanse: *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992); *Morales Morales v. E.L.A.*, 126 D.P.R. 92 (1990); *León Rosario v. Torres*, 109 D.P.R. 804 (1980); *Com. Asuntos de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Ocasio v.*

*Díaz*, 88 D.P.R. 676 (1963). Hemos resuelto que el derecho a llevar una causa de acción en daños y perjuicios es una forma de propiedad. Véanse: *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978); *Vda. de Delgado v. Boston Ins. Co.*, 101 D.P.R. 598 (1973).

Las expresiones magistrales del Juez Asociado Señor Rigau, a las cuales se unió el Juez Presidente Señor Trías Monge, así como las del Juez Asociado Señor Irizarry Yunqué en *Galarza Soto v. E.L.A.*, 109 D.P.R. 179, 183 (1979), y nuestros pronunciamientos en *Torres v. Castillo Alicea*, 111 D.P.R. 792 (1981), donde declaramos inconstitucional los límites económicos establecidos por la Ley de Reclamaciones y Demandas contra el Estado de 1955, contienen, entre otros, argumentos sólidos para sostener la inconstitucionalidad de la doctrina de la inmunidad del Estado. Veamos.

## II

*Nuestra tradición civilista*

Como expresara el Juez Asociado Señor Rigau en *Galarza Soto v. E.L.A.*, supra, págs. 185–187, la doctrina de la inmunidad del Estado es ajena a nuestro ordenamiento civilista en el área de la responsabilidad extracontractual:

[A] estas alturas en el desarrollo del Derecho y de la responsabilidad civil del Estado, éste, quien tiene ante la ley, por buenas razones, el monopolio de la violencia, no puede en un caso como el presente de tan palpable y grave negligencia ampararse en el ya anacrónico concepto de inmunidad estatal. Es de todos conocido que nuestro derecho de daños, como parte que es del Código Civil, tiene sus raíces en el Derecho Civil europeo continental. Fue como consecuencia de la invasión de 1898 que se insertaron en nuestro derecho legislativo y jurisprudencialmente doctrinas foráneas provenientes del derecho común anglosajón.

La doctrina de que el Estado es civilmente responsable es la doctrina histórica y presente del derecho civil. La doctrina lla-

mada inmunidad del soberano resultó de un desarrollo anómalo que, como veremos, no está firmemente basado sobre sus supuestos originales históricos.

La doctrina de inmunidad del Estado fundamentada en concepciones jurídicas —ya superadas— provenientes del derecho común es ajena a nuestro ordenamiento civilista y nunca debió haber sido incorporada en nuestro sistema de derecho.

## III

*Los derechos del pueblo de Puerto Rico*

El Juez Asociado Señor Irizarry Yunqué en *Galarza Soto v. E.L.A.*, supra, págs. 205–206, expresó con claridad meridiana el principio constitucional de que el Estado ejerce los poderes y derechos que el pueblo le ha delegado en su Constitución y la contradicción existente entre dicho precepto constitucional y la teoría de la inmunidad del Estado:

> ... El Estado ejerce aquellos poderes y goza de aquellos derechos que el Pueblo le ha delegado en su Constitución, que es su estatuto orgánico. *Aquellos poderes expresamente no delegados al Estado pertenecen al Pueblo. Entre ellos está el derecho de cada ciudadano a reclamarle al Estado por los daños que éste le cause.*
> Declara explícitamente nuestra Constitución, en su Preámbulo:
>
> "Que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público, *donde el orden político está subordinado a los derechos del hombre* y donde se asegura la libre participación del ciudadano en las decisiones colectivas." Párrafos tercero y cuarto, Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico. (Énfasis nuestro.)
> El Estado no puede estar inmune a los reclamos del Pueblo. Si lo estuviese, sería un contrasentido reclamar que es en el Pueblo donde radica la soberanía; se estaría negando su naturaleza y la fuente de su poder. La Carta de Derechos de nuestra

Constitución hace una enumeración de derechos que son otras tantas limitaciones de los poderes delegados al Estado. Finalmente, en su Sec. 19, declara:

"La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo." (Art. II, Sec.19.)

La Constitución no contiene una cláusula de interpretación liberal con respecto a los poderes del Estado. Por el contrario, los poderes del Estado han de interpretarse restrictivamente cuando confligen con los derechos del Pueblo. Tal es el mandato constitucional recogido en la transcrita Sec. 19. El Estado no tenía que autorizar, mediante la Ley Núm. 104 que nos ocupa, que se le pueda demandar. *El derecho a demandar al Estado está implícito en la soberanía del Pueblo, que no ha sido ni expresa ni implícitamente renunciado.* (Énfasis suplido.)

La teoría de la inmunidad del Estado choca con la esencia misma de nuestro ordenamiento constitucional democrático, al dotar al Estado de privilegios que lo sitúan jurídicamente por encima de la ciudadanía. Véase Const. E.L.A., *supra.*

## IV

*El debido proceso de ley*

La doctrina de inmunidad del Estado afecta los derechos ciudadanos fundamentales en violación a la cláusula del debido proceso de ley, al *impedir o limitar* el acceso a los tribunales de aquellas personas a quienes el Estado cause daño.

Como bien expresara el Juez Asociado Señor Irizarry Yunqué en *Galarza Soto v. E.L.A.*, supra, pág. 207:

En nuestro sistema de derecho la norma es que aquél que causa daño a otro mediante culpa o negligencia está obligado a reparar el daño causado. 31 L.P.R.A. sec. 5141. Esta responsabilidad se extiende no sólo a los actos propios sino también a los

de aquellas personas de quienes se debe responder, y en este concepto el Estado responde "en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular." 31 L.P.R.A. sec. 5142. A la luz de estas disposiciones, el resarcimiento de los daños causados por culpa o negligencia es un valor de extrema importancia.

Cuando una persona sufre daños por los actos culposos o negligentes del Estado, su reclamación cae bajo el exclusivo control de éste. La Ley Núm. 104 de 29 de junio de 1955 impone un requisito de notificación al Secretario de Justicia y prohíbe las acciones por daños y perjuicios causados por ciertas categorías de actuaciones. 32 L.P.R.A. secs. 3077a, 3081. El Estado controla el acceso a los tribunales de quienes han sufrido daño por sus actuaciones, colocando al reclamante en una posición de indefensión. *Estos obstáculos carecen de justificación suficiente. Son limitaciones arbitrarias que contravienen toda noción básica de justicia, en violación del debido proceso de ley garantizado por la Constitución del Estado Libre Asociado. Art. II, Sec. 7.* (Énfasis suplido.)

## V

*Igual protección de las leyes*

Dicha doctrina viola, además, la cláusula de la igual protección de las leyes.

Refiriéndose a la anterior Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. sec. 3077 *et seq.*, que autorizaba las demandas contra el Estado, expresó el Juez Asociado Señor Irizarry Yunqué en *Galarza Soto v. E.L.A.*, supra, págs. 208–209:

La Ley Núm. 104 en su Art. 6 crea unas excepciones a la responsabilidad del Estado, responsabilidad que dicha ley reconoce. Impide las reclamaciones contra el Estado cuando éstas surgen de las actuaciones allí contempladas. 31 L.P.R.A. sec. 3081. *Con esas excepciones está creando una distinción entre personas que están en la misma posición.* De todas las personas que constituyen el grupo de perjudicados por actuaciones del Estado, distingue aquellas cuyos daños surgen de las actuaciones contempladas en el Art. 6 y les prohíbe hacer reclamación contra el Estado. *Establece una clasificación legislativa a todas luces irrazonable.*

. . . . . . . .

Un examen de la clasificación creada por el Art. 6 de la Ley Núm. 104 demuestra que *ésta carece de nexo racional* con los propósitos de dicha ley. Por un lado, dicho estatuto reconoce el derecho de los ciudadanos a instar reclamaciones contra el Estado ante los tribunales de justicia y, por otro lado, limita ese derecho a determinados ciudadanos a base de qué funcionario o empleado del Estado causa el daño y en función de qué lo causa. Así por ejemplo, si un policía, en el desempeño de sus funciones, se excede *y negligentemente* causa daño a una persona, *el Estado responde. Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812 (1964); *Báez Vega v. E.L.A.*, 87 D.P.R. 67 (1963). Pero si puede establecerse una distinción para que la actuación negligente del policía pueda constituir *un acto culposo* suyo, procesable como uno de los delitos mencionados en dicho Art. 6, *el Estado no responde. Báez Vega,* supra. En otras palabras, *se hace depender la responsabilidad del Estado de sutilezas interpretativas a base de las cuales algunas personas tienen derecho y otras no, a reclamar por daños que el Estado les causa. Nada más arbitrario, frente a la cláusula de igual protección.* (Énfasis suplido.)

O como expresara en *Galarza Soto v. E.L.A.*, supra, pág. 199, el Juez Asociado Señor Rigau en su opinión disidente en parte y concurrente en parte:

Por ejemplo, *carece de base racional* la distinción hecha en algunos casos entre la situación cuando un policía manipula negligentemente un revólver causando daños sin intención de disparar y la situación de cuando el policía causa daños al manejar el revólver negligentemente pero habiendo tenido la intención de disparar y al hacerlo hiere a una persona inocente. *A los efectos de la persona perjudicada nada tiene que ver si al ser ésta herida debido a la negligencia del agente público, éste tuvo o no la intención de disparar. La base de la responsabilidad no es la intención de disparar; lo es la falta del debido cuidado.* (Énfasis suplido.)

y luego añadió:

... la llamada doctrina de la inmunidad estatal viola el derecho a la igual protección de las leyes al establecer que se pueden recobrar daños causados por el Estado; porque esa clasificación *carece de base racional,* lo cual también la hace inconstitucional, y porque dicha doctrina *constituye una iniquidad* en violación de uno de los principios generales del derecho

—*la equidad*— principio que permea nuestro ordenamiento jurídico. (Énfasis suplido.)

## VI

### *Las restricciones a las causas de acción por daños*

Es claro que la aprobación de la Ley Núm. 104, según enmendada, *supra*, por la Ley Núm. 30 de 25 de septiembre de 1983 (32 L.P.R.A. sec. 3077 *et seq.*), no constituyó una amplia renuncia a la inmunidad del soberano, como concluye la opinión mayoritaria, sino una legislación que vino a restringir los casos y las condiciones en los cuales se podría demandar al Estado en daños y perjuicios, más allá de los existentes al aprobarse la Constitución. Como bien ha señalado un autor:

La Ley número 104 del 29 de junio de 1955 supuestamente "autoriza" reclamaciones contra el Estado y así se hace referencia a ella. Eso es un enfoque incorrecto de esa pieza legislativa. ... [L]a ley 104 *no es un acto de liberalidad* del Estado, sino que por el contrario, *es una medida que pretende limitar los casos en que puede demandarse al Estado y para aquellos en que procede, establece condiciones precedentes*, (notificación), requisitos procesales (edictos), límites de cuantías, y prohibiciones de concesión de daños punitivos o ejemplares o de honorarios por temeridad y de imposición de intereses. Estas disposiciones sólo se exigen cuando el Estado es demandado, haciéndolo así un litigante privilegiado y estableciendo un discrimen en cuanto a otras personas o entidades que se hallen en la misma situación. (Énfasis suplido.) R. Elfren Bernier, *¿Es inconstitucional en Puerto Rico la doctrina de inmunidad del Estado?*, 43 Rev. C. Abo. P.R. 651, 654 (1982).

Como hemos señalado, el estatuto referido debe ser examinado mediante un escrutinio estricto por parte de este Foro, pues afecta los derechos fundamentales de los ciudadanos. Al tratarse de una pieza legislativa que debe ser sometida a un escrutinio estricto por parte de este Foro, debemos evaluar si las disposiciones de la ley —aquí impugnadas— persiguen un interés apremiante del Es-

tado, y si constituyen el método para conseguir dicho fin y ser el menos oneroso a los intereses ciudadanos afectados. Veamos.

## VII

*No existe un interés público apremiante*

Primero, la disposición de ley para imponer un límite económico a las demandas contra el Estado ¿persigue un interés público apremiante del Estado?

Corresponde al Estado, en casos en los cuales se impugna la constitucionalidad de una ley que afecta derechos fundamentales de los ciudadanos el peso de la prueba, demostrar la constitucionalidad de la disposición de ley referida. La declaración de la Asamblea Legislativa, en cuanto a que durante la fecha en que los límites referidos dejaron de estar en vigor, ante nuestros pronunciamientos en *Torres v. Castillo Alicea*, supra, se informó "un considerable aumento en las cuantías reclamadas en las demandas contra el Estado, así como en la cuantía por concepto de las sentencias recaídas" lo cual ha tenido "un impacto significativo en los recursos del fisco" al aumentar éstas de un millón setenta y un mil setecientos cuarenta y ocho dólares ($1,071,748) en 1981 a cinco millones setecientos quince mil quinientos dieciséis dólares ($5,715,516) en 1982, *no nos resulta suficiente* para demostrar la necesidad para el Estado del mecanismo adoptado. Véase Informe de las Comisiones de lo Jurídico Civil y de Gobierno de la Cámara de Representantes sobre el P. de la C. 1033 de 17 de agosto de 1983, 9na Asamblea Legislativa, 7ma Sesión Extraordinaria.

¿Representa esto un riesgo real para las finanzas del Estado que amenaza su capacidad para brindar servicios a la ciudadanía en general? Ciertamente no lo representa. *En 1982 la cantidad pagada en sentencias constituyó tan sólo un .14% de los fondos estimados correspondientes al*

*Gobierno Central ($13.364.6 millones) para ese año.* El Estado gasta mucho más en actividades que no encierran derechos constitucionales fundamentales.

En segundo lugar, el método adoptado por la Legislatura ¿es el menos oneroso a los derechos e intereses de los ciudadanos afectados por la ley? Entendemos que no lo es.

El Estado moderno tiene la responsabilidad de proteger a la ciudadanía y de acudir en su auxilio, así como de promover activamente la distribución equitativa de las riquezas. Serrano Geyls, *op. cit.*, pág. 4. En virtud de tales deberes, el Estado —en vez de reclamar inmunidad— debe ser quien con mayor prontitud y diligencia repare los daños que cause mediante sus actos antijurídicos. El Estado, responsable de la elaboración de las leyes y de velar y garantizar su cumplimiento, no debe quedar al margen de ésta cuando la haya quebrantado. Al contrario, debe ser ejemplo del cumplimiento estricto con la norma jurídica. En casos de daños, en vez de perpetuar el desequilibrio y la inequidad al allegarse privilegios que lo eximen de cumplir con sus responsabilidades, de la misma forma en que se le exige a los ciudadanos privados, debe procurar el restablecimiento pleno de la normalidad jurídica, restaurando el equilibrio violentado por su infracción. Véase A. Borrell Macía, *Responsablidades derivadas de culpa extracontractual civil*, 2da ed., Barcelona, Ed. Bosch, 1958, págs. 188–194. La inmunidad del Estado, "en síntesis, conduce al siguiente entimema: el Estado es irresponsable; luego, se encuentra fuera de las normas jurídicas que él, obedeciendo a su fin esencial, se halla encargado de amparar y asegurar". L. Colombo, *Culpa Aquiliana*, Buenos Aires, Ed. La Ley, 1944, pág. 419.

El permitir que se perpetúe el desequilibrio creado por la actuación culpable o negligente del Estado o sus funcionarios bajo el único argumento de que no se afecten las finanzas del Gobierno es irrazonable. Nuestra Constitución establece claramente la subordinación de los valores

económicos a los valores del ser humano que en ella se consagran. Préambulo, Const. E.L.A., *supra.*

No resulta justo ni razonable que recaiga precisamente sobre aquéllos, quienes han tenido el infortunio de verse afectados por la infracción estatal, tener que contribuir de forma desproporcionada y extraordinaria a la protección de las finanzas del Estado, al ser privados de recibir compensación por la totalidad de los daños sufridos por ellos. "Cuando hay justicia a medias, también hay injusticia a medias." Bernier, *supra*, pág. 661.

> Si las cargas públicas deben ser repartidas entre todos los ciudadanos en razón de sus facultades ..., si ese peso no puede gravitar más gravemente sobre un ciudadano que sobre otro, el principio de igualdad de las cargas exige la reparación por el Estado del daño causado a un particular por el funcionario del poder público. Decidir otra cosa y hacer soportar el perjuicio por el ciudadano sería reclamarle una prestación extraordinaria, sin proporción con sus facultades ni con la contribución impuesta a los demás ciudadanos. El vecino de una calle pública, al cual le privan el acceso las transformaciones efectuadas en esa calle; el cultivador cuyo campo es asolado por el paso de un ejército; los herederos de un transeúnte muerto en la vecindad de un campo de tiro por un obús extraviado, ¿no sufrirá más que los otros el peso de las cargas públicas si el perjuicio así causado no fuese resarcido? Por consiguiente, el ciudadano lesionado por el funcionamiento de un servicio público encuentra en el principio de igualdad de las cargas del derecho a la reparación de los perjuicios. Colombo, *op. cit.*, págs. 426–427.

En resumidas cuentas, la Ley Núm. 104, *supra*, violenta las garantías del Art. I, Sec. 7 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1. Así lo ha reconocido esta Curia en el pasado. Abundemos sobre el particular.

## VIII

*Nuestra jurisprudencia anterior*

Discrepo de la interpretación que hace la mayoría del Tribunal sobre nuestra jurisprudencia pasada en este tema.

Ésta sostiene que nuestro Foro no se ha expresado sobre el problema de los límites en sí, sino que nuestros pronunciamientos en *Torres v. Castillo Alicea*, supra, y en *Colón v. Municipio de Guayama*, 114 D.P.R. 193 (1983), se ciñeron a disponer que el mecanismo de la dispensa legislativa era inconstitucional porque violenta el sistema de separación de poderes. Dicha interpretación es equivocada.

En *Torres v. Castillo Alicea*, supra, el argumento de la separación de poderes —dada la impermisible intervención legislativa en un ámbito inherentemente judicial creada por el mecanismo de la dispensa— *no fue la única razón que motivó la decisión de este Foro* al declarar la inconstitucionalidad de los límites económicos establecidos por la Ley de Reclamaciones y Demandas contra el Estado de 1955. Expresamos allí nuestra preocupación por la "situación de desigualdad [creada ante] la irrisoria indemnización a que el desarrollo de la economía ha reducido estos valores de 1955, pasados 26 años, *que impide toda semblanza de adecuada compensación* en un número sustancial de reclamaciones, *pues se pierde toda proporción entre la gravedad del daño y la compensación disponible*". (Énfasis suplido.) *Torres v. Castillo Alicea*, supra, pág. 799. Señalamos claramente en aquella ocasión, como elemento primario de nuestra decisión, la irrazonabilidad del límite legal dada "la desvalorización de la moneda al impulso de las fuerzas inflacionarias", lo cual *"primero*, niega a los demandantes en daños y perjuicios con reclamaciones mayores contra el Estado, mediante [la] fijación de un límite económico arbitrario, la indemnización que corresponde a la magnitud de su pérdida; y *segundo*, coloca a dichos de-

mandantes en desigualdad con los que se benefician [de la dispensa legislativa]". (Énfasis suplido.) *Torres v. Castillo Alicea*, supra, pág. 800. Afirmamos que los perjudicados por el Gobierno tenían "derecho a una *total y plena* vindicación de su derecho en las cortes de justicia". (Énfasis suplido.) *Torres v. Castillo Alicea*, supra, pág. 803. *Por ello decretamos la inconstitucionalidad de los límites, cuando pudimos habernos limitado a decretar la inconstitucionalidad del mecanismo de la dispensa legislativa y mantener los límites iguales para todo litigante.*

De haber quedado alguna duda en nuestra decisión en *Torres v. Castillo Alicea*, supra, sobre la inconstitucionalidad *de los límites económicos*, ésta no debió sobrevivir ante nuestros señalamientos en *Colón v. Municipio de Guayama*, supra. De entrada, allí señalamos que en *Torres v. Castillo Alicea*, supra, habíamos resuelto que "las disposiciones de la Ley de Pleitos contra el Estado, *en cuanto limitaban su responsabilidad por daños* provenientes de culpa o negligencia son inconstitucionales". *Colón v. Municipio de Guayama*, supra, pág. 195. Argumentamos que nuestra decisión se fundamentó, entre otros, en lo irrisorio de la compensación y en que el límite fijado no toma en consideración "la magnitud de la pérdida del reclamante". Más aun, en esa ocasión, ante el argumento del Municipio de que los límites en su caso no eran irrazonables, pues sus finanzas no son comparables con los fondos disponibles del Estado, este Foro señaló que "*la disponibilidad de fondos públicos no puede ser un criterio determinante* para decidir si una persona tiene derecho a que se le proteja de la aplicación de una ley que afecta sus derechos constitucionales. El Gobierno, sea estatal o municipal, debe repartir el costo de administrar los asuntos públicos entre los miembros de la sociedad, del mismo modo en que se reparte el costo de los servicios gubernamentales esenciales a los costos de ornato y recreo públicos". (Énfasis suplido.) *Colón v. Municipio de Guayama*, supra, págs. 201–202. Véanse, además:

*Arce Oliveras v. E.L.A.*, 122 D.P.R. 877 (1988); *Rodríguez Ríos v. E.L.A.*, 116 D.P.R. 102, 104 (1985).

Este Foro *sí* se ha enfrentado al problema de los límites de la responsabilidad del Estado en acciones de daños y perjuicios *y ha resuelto que son inconstitucionales por irrazonables. La legislación vigente adolece de los mismos defectos*. Ésta no sólo coloca al Estado por encima de los ciudadanos privados, y exige a los afectados por el Estado, en exceso de los límites de ley, una contribución excesiva en protección del fisco estatal, sino que, además, compensa en su totalidad al que sufre daños menores, mientras que aquellos que sufren daños mayores de setenta y cinco mil dólares ($75,000) o ciento cincuenta mil dólares ($150,000), según sea el caso, les brinda el resarcimiento a medias, con el terrible agravante de que a medida que se agrave el daño sufrido, menor resulta la compensación en términos proporcionales. A ésta sin razón de no tomar en consideración la magnitud de la pérdida del reclamante, se suma que el actual sistema legislativo no incorporó nuestros señalamientos en *Torres v. Castillo Alicea*, supra, respecto a la desvalorización de la moneda con el paso del tiempo. La irrazonabilidad del esquema legislativo en cuanto a este particular resulta obvia. Fijar los límites máximos, mediante los cuales se pueda condenar al Estado a resarcir un daño en determinada unidad de moneda, en abstracción del cambio en el poder adquisitivo de ésta, tiene el efecto de instituir una ley que de manera creciente discrimina e incrementa su inequidad básica durante el transcurso del tiempo desde el momento en que se aprobó. *Cf.* F.J. Bonilla Ortiz, *Los límites económicos en las demandas contra el Estado*, 54 Rev Jur. U.P.R. 761, 768 (1985). Aumentar la cuantía del límite, como se hizo con la aprobación de la ley hoy vigente, no subsana la arbitrariedad inherente a dicho mecanismo.

Lo anterior se agrava cuando consideramos que quienes más utilizan —y hasta cierto punto dependen de los servi-

cios del Estado— y quienes ven sus vidas afectadas de forma más directa por la intervención del aparato estatal —por lo cual quedan más propensos a sufrir daños causados por éste— son los sectores de nuestra población de ingresos económicos moderados y bajos. Éstos son quienes carecen muchas veces de otras alternativas y acuden al Estado en búsqueda de empleo, educación, vivienda, salud y seguridad, entre otros. Por lo tanto, la inmunidad limitada del Estado, en la práctica, afecta a los sectores económicos más bajos de nuestra población. En este sentido, la ley estatuye un discrimen inaceptable e indirecto contra este sector de la población. *Cf. Molina v. C.R.U.V.*, 114 D.P.R. 295 (1983), opinión concurrente del Juez Asociado Señor Irizarry Yunqué, a la cual se unió el Juez Presidente Señor Trías Monge.

El mecanismo adoptado por la Asamblea Legislativa no sólo resulta abusivo hacia los litigantes contra el Estado que sufran daños mayores de los límites establecidos, sino que, además, no es la mejor manera de promover los intereses resguardados por la legislación, *en la medida en que no promueve la administración pública más diligente y responsable.* Esto trae como consecuencia que se perjudiquen las finanzas estatales, no por la cantidad a ser pagada en un pleito particular, *sino por la multiplicidad de pleitos que promueve la insensibilidad de una administración pública que actúa con dejadez y con aire de inmunidad y despreocupación al causar daño a los ciudadanos particulares.*

El establecimiento completo y sin trabas de la responsabilidad del Estado por sus actos culposos y negligentes no sólo lograría corregir graves injusticias y garantizar la igual protección de las leyes, sino que además surtiría otra serie de efectos beneficiosos para la comunidad. *Habría un más cuidadoso desempeño de las labores gubernamentales, una supervisión más adecuada de los trabajos que realizan los empleados públicos y una mayor eficiencia en las prestaciones de los servicios administrativos.* Más importante, aún, los tribunales vendrían a ser el foro imparcial e independiente donde se determinaría

la legalidad de los actos de los funcionarios gubernamentales. No se daría margen a la fundada crítica de que el Poder Ejecutivo es el que hace la determinación de cuando es que han actuado de manera impropia los funcionarios de esa rama gubernamental. La doctrina de responsabilidad completa del gobierno cuando incurra en culpa o negligencia resultaría más adecuada para la protección de las garantías individuales de los habitantes que todas las Comisiones de Derechos Civiles que pudieran organizarse. (Énfasis suplido.) Bernier, *supra*, pág. 677.

La forma más racional de proteger el fisco es promover una administración pública que se sienta responsable y tome plena conciencia de las consecuencias de sus actos y omisiones culposas y negligentes. La sentencia que no se pague en un pleito particular puede terminar pagándose en proporciones geométricas, producto de pleitos individuales fundamentados en actuaciones que no se corrigen ante la posición privilegiada que le brinda el estatuto al Estado.

## IX

*¿Qué es hoy el sector público?*

Por otro lado, la explicación con la cual el Tribunal justifica la diferencia entre los ciudadanos privados y el Gobierno, en términos de su responsabilidad por actos torticeros, no sólo hace abstracción de los principios sobre los cuales se funda nuestro ordenamiento democrático —como ya hemos señalado— sino que además resultan poco convincentes.

En la actualidad la diferencia entre lo que constituye el sector público y el sector privado *se presenta de manera difusa* en términos de los servicios que prestan unos y otros y del tipo de actividades que pueden o deben llevarse a cabo por una u otra entidad. La diferencia ha sido fuertemente cuestionada y parece responder más a consideraciones de tipo pragmático y económico que jurídico.

Véanse: H.J. Firendly, *The Public–Private Penumbra*, 130 U. Pa. L. Rev. 1289 (1982); D. Kennedy, *The Stages of the Decline of the Public/Private Distinction*, 130 U. Pa. L. Rev. 1349 (1982); M.J. Horwitz, *The History of the Public/Private Distintion*, 130 U. Pa. L. Rev. 1423 (1982); C.D. Stone, *Corporate Vices and Corporate Virtues: Do Public/Private Distinction Matter?*, 130 U. Pa. L. Rev. 1441, 1449–1451 (1982); J. Williams, *The Development of the Public/Private Distinction in American Law*, 64 Tex. L. Rev. 225 (1985); G.E. Frug, *The City as a Legal Concept*, 93 Harv. L. Rev. 1059 (1980).

El fenómeno reciente de la privatización de empresas y servicios públicos y el auge de las empresas comunes público-privadas pone al relieve la fragilidad del esquema estatutario que sostiene la opinión mayoritaria.

## X

*Los honorarios de abogado e intereses por temeridad*

Un último señalamiento, ¿por qué la opinión mayoritaria no dispone nada acerca del señalamiento de los recurrentes en torno a la inconstitucionalidad de la Regla 44.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III, la cual exime al Estado del pago de honorarios de abogados e intereses por temeridad? *Cf. Colondres Vélez v. Bayrón Vélez*, 114 D.P.R. 833 (1983); *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990). Ciertamente, con respecto a este particular, ante la imposibilidad de utilizar el argumento de la quiebra del Estado, las justificaciones de la mayoría se debilitan. Esto, sin embargo, no le exime de disponer del planteamiento. Por mi parte, debido a los mismos fundamentos que he esbozado antes, declararía inconstitucional la regla referida de Procedimiento Civil en cuanto a dicho particular.

## – O –

Voto separado de conformidad emitido por el Juez Asociado Señor Fuster Berlingeri.

En general estoy conforme con el análisis que hace la mayoría en su opinión respecto al asunto ante nuestra consideración en este caso. También coincido en general con los pronunciamientos normativos que se expresan en la opinión mayoritaria.

No obstante, formulo este voto separado de conformidad para comentar una peculiaridad que confrontamos en Puerto Rico cuando interpretamos nuestra Constitución, lo cual claramente se refleja en la opinión de la mayoría.

Como bien se discute en el Acápite IV A de la opinión mayoritaria, el asunto de la *inmunidad soberana* fue objeto de un amplio debate durante la Convención Constituyente de Puerto Rico. Allí prevaleció finalmente un claro criterio sobre este asunto, que constituye la intención definitiva de los que redactaran nuestra ley fundamental. La posición incuestionable que asumió la mayoría de la Constituyente fue en el sentido de que las limitaciones al principio de inmunidad soberana —que fueran menester adoptar— serían aquellas que la Asamblea Legislativa decidiese establecer posteriormente en el ejercicio de sus facultades constitucionales. Es decir, la Convención Constituyente rehusó conculcar palmariamente el principio de inmunidad soberana al dejar el asunto de su extensión y magnitud a la discreción de la Asamblea Legislativa de Puerto Rico.

A la luz de esta clara y terminante intención de la mayoría de los miembros de la Convención Constituyente, el análisis del planteamiento de la inconstitucionalidad —de ordinario— no debía requerir nada más que *dilucidar* y *exponer* cuál fue la intención de los que redactaron la Constitución. No debería ser necesario realizar, también,

un análisis independiente de la cuestión de marras, a la luz de las garantías de igual protección de las leyes y del debido proceso de ley de nuestra Constitución, como se hace en la opinión de la mayoría. Es un principio elemental de hermenéutica que la Constitución debe interpretarse *integralmente*, como un todo armonioso. Inexorablemente, ésta constituye un esquema normativo coherente. No puede suponerse que una cláusula de la Constitución ordene o autorice lo que otra cláusula prohíbe. No puede suponerse que la Constitución se aprobó con determinada finalidad en cuanto a un asunto, pero que algunas disposiciones de ésta permiten o requieren una finalidad contraria respecto a ese mismo asunto. Como dijimos en *Fuster v. Busó*, 102 D.P.R. 327, 339 (1974), "[l]as constituciones no son autodestructivas. *Billings v. U.S.*, 232 U.S. 261 (1914). ... no debe presumirse que una cláusula de la Constitución ... destruye el propósito de otra cláusula del mismo documento". Por ello, una vez se ha explorado y se ha puesto de manifiesto la intención sobre el particular de los que formularon la Constitución, no debería ser necesario examinar por separado otras fuentes de este documento ya que el resultado tendría que ser el mismo. La investigación de otras disposiciones constitucionales parecería ser, en el mejor de los casos, una redundancia innecesaria.

Ahora bien, lo que de ordinario sería la técnica de interpretación constitucional apropiada no es siempre la que tenemos que seguir en nuestra jurisdicción. En Puerto Rico tenemos la peculiaridad de que nos hemos comprometido a interpretar las garantías fundamentales de nuestra Constitución de manera conforme con la interpretación que el Tribunal Supremo de Estados Unidos le dé a las garantías similares de la Constitución norteamericana. Desde *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416, 427 (1964), hemos resuelto invariablemente que:

...los poderes públicos y los tribunales del Estado Libre Aso-

ciado harán efectivas e interpretarán las disposiciones de la Carta de Derechos de manera compatible con la protección que ofrecen a esas libertades básicas y garantías personales iguales o similares disposiciones de la Constitución de los Estados Unidos, y no en menor grado de protección, según éstas son o sean interpretadas y aplicadas por el Tribunal Supremo de Estados Unidos ....

Por ello, y no porque nuestra ley fundamental no sea internamente armoniosa y coherente, es que resulta inevitable en muchos casos —como el de autos— dilucidar la cuestión ante nos no sólo a base del *historial* de nuestra Constitución, sino además aisladamente con arreglo a otras cláusulas de la misma, para examinar los contenidos adicionales que por superposición éstas puedan tener, a la luz de las normas federales pertinentes. Por eso, para mí se justifica que en la opinión de la mayoría se haga lo que de otra forma sería improcedente: primero analizar "si la doctrina de la inmunidad soberana es inconsistente con nuestro ordenamiento constitucional" (opinión mayoritaria, pág. 46), para luego examinar aparte si es compatible con las garantías de nuestra Constitución sobre la igual protección de las leyes y el debido proceso de ley.